20 N.J. Super. 43 (1952)
89 A.2d 264
WESLEY EDWARDS, ET AL., PLAINTIFFS,
v.
JERRY LEOPOLDI, ET AL., DEFENDANTS-RESPONDENTS.
ARTHUR McBRIDE, ET AL., PLAINTIFFS,
v.
MILTON WEIHRAUCH, ET AL., DEFENDANTS-RESPONDENTS.
UNITED ELECTRICAL, RADIO & MACHINE WORKERS OF AMERICA, INTERVENOR-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 28, 1952.
Decided May 27, 1952.
*44 Before Judges McGEEHAN, JAYNE, and GOLDMANN.
Mr. Morton Stavis argued the cause for intervenor-appellant (Messrs. Gross & Blumberg, attorneys; Mr. William Rossmoore, of counsel).
Mr. Sol D. Kapelsohn argued the cause for respondents (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
The opinion of the court was delivered by JAYNE, J.A.D.
It will be elucidative immediately to explain that although the final judgments entered in the two above-entitled actions are implicated in the present appeals, only the case of Edwards, et al., v. Leopoldi, et al., was submitted to final hearing, and by stipulation a judgment "to the same effect and in the same tenor" as that rendered in the Edwards case was entered in McBride, et al., v. Weihrauch, et al. The Edwards case was prosecuted at the final hearing solely by the intervenor and present appellant, United Electrical, Radio & Machine Workers of America.
*45 The following prefatory announcement was made by counsel at the inception of the final hearing:
"Essentially what the case comes down to, as stated by your Honor at a conference at the bar is: Who is entitled to the funds of Local 447, and it is an action more or less in the nature of an accounting for the funds of U.E. Local 447."
Since the titles of the several associations to which reference will be made are somewhat lengthy, it will be expedient to employ the following symbolic designations: "C.I.O." for Congress of Industrial Organizations; "U.E." for United Electrical, Radio & Machine Workers of America, the intervenor and active plaintiff; "U.E.-C.I.O." for U.E. in its status as an affiliate of C.I.O.; "I.U.E." for International Union of Electrical, Radio & Machine Workers, which was given a charter by the C.I.O. upon the expulsion of U.E. from its affiliation with C.I.O.; and "Local 447" for the local union the assets of which are involved in the present litigation.
It is significantly informative to chronologize the prominent events. The C.I.O. is an international federation with which U.E. became affiliated on November 16, 1938. The U.E. is a national labor union having affiliated with it numerous local unions. Local 447 was organized by U.E. and received its charter as an affiliate of U.E. on November 4, 1941. By a resolution adopted at a convention of C.I.O. on November 2, 1949, U.E. was expelled from C.I.O. On January 10, 1950, Local 447 terminated its affiliation with U.E. and received a charter from I.U.E., which was organized as an affiliate of C.I.O.
The charter issued to Local 447 by U.E. contained the following contractual engagement: "It is hereby agreed in the acceptance of this Charter that the aforesaid Union shall conform to the Constitution, Rules and Regulations of the United Electrical, Radio and Machine Workers of America," herein designated U.E.
*46 The related provisions of the constitution of U.E. applicable to its locals are sections N and O of Article 18:
"Section N. If a local disbands, the local secretary and trustees shall send all funds and property belonging to the local to the General Secretary-Treasurer. The General Secretary-Treasurer shall hold this property intact for one year. If within that time, an application is made by at least fifteen (15) former members, a charter will be reissued and the funds and the property returned. Should no application be made within the year, the funds and property shall revert to the International Union.
Section O. Any local union whose good standing members fall below seven (7) may have its charter revoked in accordance with the provisions of Article 18, Section N, and Article 10, Section I, of the International Constitution. Members of such a group may become members-at-large, affiliated directly with the International Union in accordance with Article 20, Section C, or they may transfer to other local unions in the area.
Any disbandment, dissolution, secession or disaffiliation of any local shall be invalid and null and void if seven or more members indicate their desire to retain the local charter."
The intervenor, U.E., insists that upon the disbandment, secession or disaffiliation of a local such as Local 447, its property belongs to U.E. The validiy of the disaffiliation is not impugned.
Expedient also will be the quotation of some excerpts lifted from the opinion of the learned judge of the Chancery Division which display the course of deductive reasoning through which he reached his conclusion:
"Urged upon the court is the holding by the courts in this and other states that the relationship between members of an unincorporated corporation and between parent and subordinates thereof is contractual, and that the terms of the contract are to be found in the applicable constitutions. With this contention the defendants agree but say that in the instant case affiliation of UE with CIO became an implied condition of the contract of affiliation between Local 447 and UE, which compact was dissolved when the implied condition ceased to exist, and thereupon the UE constitution was no longer enforceable against the defendants.

* * * * * * * *
I think it has been adequately established by the defendants that the continued affiliation of the UE with the CIO was an essential condition of the contractual relationship that existed between the *47 Local and the UE, and that when the UE was expelled from the CIO the most essential requirement for the continuance of the executory contractual relation ceased to exist.
In my opinion, the decision of this court in the case of Duris v. Iozzi, 6 N.J. Super. 530, 70 A.2d 793 (Ch. Div. 1949), controls the instant case. In the Duris case it was held that when the continued existence of a state of facts is an implied condition going to the essence of the contract, the destruction of that state of facts puts an end to the contract itself."
The opportunity elaborately to collate the many adjudications in the several jurisdictions pertaining to the general subject to which this case relates is not available. Attention must, however, be applied to the relatively recent majority and dissenting opinions in Harker v. McKissock, 10 N.J. Super. 26 (App. Div. 1950), the modifying conclusions of the Supreme Court on appeal, 7 N.J. 323 (1951); Walter Kidde & Co., Inc., v. United Electrical, Radio, etc., 7 N.J. 528 (1951); United Public Workers of America v. Fennimore, 6 N.J. Super. 589 (Ch. Div. 1950); Duris v. Iozzi, 6 N.J. Super. 530 (1949); International Union, &c., C.I.O. v. Becherer, 142 N.J. Eq. 561 (Ch. 1948), affirmed 4 N.J. Super. 456 (App. Div. 1949), certif. denied 3 N.J. 374 (1949).
There is a noticeable proclivity of relatively recent origin in the conception and rationalization of cases of this nature to excommunicate the agreement embodied in the constitutions and laws of labor unions from the family of contracts and to deem the relationship sui generis and largely immune from the application of the settled principles of the law of contracts. It is suggested that the contract theory in such relationships is not a reality but a legal fiction and that voluntary associations of this class are not the creatures of a pure contract but of a "social compact" or "consensual engagement." It may be conjectured that the word "compact" is chosen because in analogy the Federal Constitution has been styled a compact between the states by which it was ratified.
*48 However, our Supreme Court has spoken decisively concerning that deviation:
"* * * And the contract rationalization is generally considered sound and adequate. A voluntary association of this class is in its very nature a creature of contract by its members, though it is not necessarily a legal entity for all purposes distinct from its component members.
The articles of agreement are embodied in the constitution and laws of the association; and it is fundamental in the law of contracts that the legal rights and duties thereby arising shall be enforced as written unless condemned by the law. The conventional combination derives its force from and subsists by the will of the parties, and its dissolution entails such consequences as the parties have stipulated, consistent with law and established public policy. The contract establishes the rights of the association and the component unions and the individual members, in relation to one another."
Harker v. McKissock, 7 N.J. 323, 329 (1951). Vide, Cameron v. International Alliance, &c., U.S. & Canada, 119 N.J. Eq. 577 (E. & A. 1936); Fidelity, &c., Co. v. Brotherhood, &c., America, 120 N.J. Eq. 346 (E. & A. 1936).
The defendants ask us to observe that under the operation of section N it is only where a local "disbands" that "the funds and property revert to the International Union." Their insistence is that although Local 447 has seceded, it has not disbanded. Was the word "disband" as employed in the constitution intended by its practical import and meaning to embrace the action taken by Local 447? We resolve that question in the affirmative. This precise point was advanced by the seceding group in Walter Kidde & Co., Inc., v. United Electrical, Radio, etc., supra. In Brown v. Hook, 79 Cal. App.2d 781, 180 P.2d 982 (1947), the word "disband" so used was held to include the withdrawal or secession of the local lodge. See, also, Subsidiary High Ct. v. Pestarino, 41 Cal. App. 712, 183 P. 297 (1919); Rosenthal v. Reinfeld, 48 Misc. 652, 96 N.Y.S. 199 (Sup. Ct. 1905); Henry v. Cox, 25 Ohio App. 487, 159 N.E. 101 (1927); Grand Council Provincial Workmen's Ass'n. v. McPherson, 8 Dom. L.R. 672 (Canada 1912); Fitzgerald v. Abramson, 89 F. Supp. 504 (D.C.S.D.N.Y. 1950).
*49 Obviously the provisions of the U.E. constitution were designed to preserve the connection and to protect the rights of the U.E. and of the loyal minority of the local. At the time of the trial of the present action the group of more than seven in number who it may be had previously sought to continue the local and retain its affiliation with U.E. also withdrew, effectuating a complete secession. Thus Local 447 disunited the interconnection, disbanded its organization with U.E., and discharged itself from further united service with its parent. In that sense it disbanded. Webster's International Dictionary (2d ed.) p. 741.
We now encounter those subjects of the present appeal that are more susceptible of debate. The decision under review introduces the consideration of the essential elements of that which we speak of in the law as an implied condition and more remotely of the so-called doctrine of frustration of purpose. The two are distinguishable. Nor is frustration of purpose identical with impossibility of performance, although the latter seems to be included in the category of the former.
Juristically, the concept of circumstances constituting frustration which dissolves the obligations of a contract is a relatively new theoretical invention of the courts. Its foundation is discernible in the trilogy of English decisions delivered by Lord Wright in Joseph Constantine Steamship Line, Ltd. v. Imperial Smelting Corporation, Ltd., A.C. 154 (1942); Denny Mott & Dickson, Ltd. v. James B. Fraser & Co., Ltd. A.C. 265 (1944); Cricklewood Property & Investment Trust v. Leighton's Investment Trust, Ltd., A.C. 221 (1945).
In those cases Lord Wright explains that the court exercises a power to qualify the literal terms of the contract in order to do what is just and reasonable in consequence of the occurrence of a supervening event. He went on to say:
"The doctrine is invented by the court in order to supplement the defects of the actual contract. The parties did not anticipate fully and completely, if at all, or provide for, what actually happened. It *50 is not possible, to my mind, to say that if they had thought of it, they would have said: `Well, if that happens all is over between us.'"
In the recent English case of British Movietonews, Ltd. v. London & District Cinemas, Ltd., 1 K.B. 190 (1951), Denning, L.J., stated:
"This does not mean that the courts no longer insist on the binding force of contracts deliberately made. It only means that they will not allow words, in which they happen to be phrased, to become tyrannical masters. * * * The day is done when we can excuse unforeseen injustice by saying to the sufferer: `You ought to have put in a clause to protect yourself.'"
The doctrine of frustration is probably the offspring of the theory of implied condition. Taylor v. Caldwell, 3 B. & S. 826 (1863). It has been said that the implied condition is "really a device by which the rules as to absolute contracts are reconciled with a special exception which justice demands."
A case often referred to in the discussion of this subject is Krell v. Henry, 2 K.B. 740 (C.A. 1903), in which the author of the opinion remarked:
"I think you first have to ascertain, not necessarily from the terms of the contract, but, if required, from necessary inferences, drawn from surrounding circumstances recognized by both contracting parties, what is the substance of the contract, and then to ask the question whether that substantial contract needs for its foundation the assumption of the existence of a particularly state of things."
Since the decision in Krell v. Henry, supra, and the other so-called "coronation cases," the doctrine of frustration has been invoked by the American courts under a variety of circumstances despite the possibility of literal performance of the contract. Frustration of the object or effect of a contract was recognized by the American Law Institute in the Restatement of the Law of Contracts, section 288:
"Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both *51 parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears."
Additional informative sources are: 6 Williston on Contracts (Rev. Ed.) 5477, sec. 1954; 6 Corbin on Contracts 372, c. 77; Buckland, Frustration in Roman and Common Law, 46 Harv. L. Rev. 1281 (1933); Patterson, Constructive Conditions in Contracts, 42 Columbia L. Rev. 903, 949; 49 Illinois L. Rev. 290, 294 (1945).
The declarations of war and the consequential conditions, the restrictions upon the commercial trades, the economic depression, the shortages of materials, the strikes and such like occurrences have noticeably generated the tendency of the decisional law toward an enlargement of the defense of impossibility of performance.
The courts now indulge in the more liberal inquiry whether the continuance of a particular one or special group of circumstances appears from the intrinsic subjectiveness of the contract, interpreted in the setting of the occasion, to have been a tacit or implied presupposition in the minds of the contracting parties, conditioning their faith in a continuing obligation. Vide, Canadian Industrial Alcohol Co. v. Dunbar Molasses Co., 258 N.Y. 194, 198, 179 N.E. 383 (Ct. App. 1932); 6 Williston on Contracts 5418, sec. 1935.
Let us now return to our own jurisdiction where the principles of implied condition and impossibility of performance have not been conspicuously stretched under the cognominal doctrine of frustration.
A summary exposition of the pertinent decisional law in our State might well begin with the pronouncement of the Supreme Court in School Trustees v. Bennett, 27 N.J.L. 513 (Sup. Ct. 1859):
"No rule of law is more firmly established by a long train of decisions than this  that where a party, by his own contract, creates a duty or charge upon himself he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he *52 might have provided against it by his contract; therefore, if a lessee covenant to repair a house, though it be burned by lightning or thrown down by enemies, yet he is bound to repair it. * * * No matter how harsh and apparently unjust in its operation the rule may occasionally be, it cannot be denied that it has its foundation in good sense and inflexible honesty. He that agrees to do an act should do it unless absolutely impossible. He should provide against contingencies in his contract. Where one of two innocent persons must sustain a loss, the law casts it upon him who has agreed to sustain it, or, rather, the law leaves it where the agreement of the parties has put it. The law will not insert, for the benefit of one of the parties, by construction, an exception which the parties have not, either by design or neglect, inserted in their engagement."
The conviction expressed in that case has been followed concordantly by an impressive procession of decisions of which only a few need be cited: Coles v. Celluloid Mfg. Co., 39 N.J.L. 326 (Sup. Ct. 1877), affirmed 40 N.J.L. 381 (E. & A. 1878); Middlesex Water Co. v. Knappmann Whiting Co., 64 N.J.L. 240 (E. & A. 1900); Costa v. Cranford, 75 N.J.L. 542 (E. & A. 1907); Kupfersmith v. Delaware Ins. Co., 84 N.J.L. 271 (E. & A. 1913); Transparent Rub. Works v. Internat. Glass Co., 92 N.J.L. 461 (E. & A. 1918); Hess v. Tube Zone Realty Company, 94 N.J.L. 4 (Sup. Ct. 1920); Schaefer v. Brunswick Laundry, Inc., 116 N.J.L. 268 (E. & A. 1936).
Our Court of Errors and Appeals in Schaefer v. Brunswick Laundry, Inc., supra, stated: "Generally, impossibility of performance offers no relief from the performance of contractual obligations, whether the impossibility could or could not have been foreseen at the time of the making of the contract." The three exceptions to this rule were therein specified to be (1) where the impossibility arises by operation of law; (2) where a thing necessary to performance is destroyed; and (3) where the contract calls for personal services, and the party to perform or receive performance dies.
It must, however, be understood that the rule so announced is not universally applicable. It has been commonly applied in cases in which the promisor guaranteed or warranted the *53 performance or assumed the risk of impossibility. See, Bozarth v. Dudley, 44 N.J.L. 304, on p. 311 (Sup. Ct. 1882); Middlesex Water Co. v. Knappmann Whiting Co., supra; Matthews Construction Co. v. Brady, 104 N.J.L. 438, 443 (E. & A. 1928).
The rule in equity has been that it will not relieve against hardship arising from bad judgment, miscalculation, or from a change in circumstances or the result of subsequent events, where these should have been in the contemplation of the parties as possible contingencies when they entered into the contract. Lincoln Bus Co. v. Jersey Mutual, &c., Co., 112 N.J. Eq. 527 (Ch. 1933); 5 Pom. Eq. Jur. 4958.
Cases in our New Jersey reports typical of fortuitous and purely adventitious instances of frustration entirely disassociated from any act of the parties are scarce. One early, one intermediate, and one recent case may be mentioned. In Mutual Benefit Life Ins. Co. v. Hillyard, 37 N.J.L. 444 (E. & A. 1874), the court was concerned with whether a preexisting contract was dissolved by the occurrence of the Civil War. In Brauer v. Hyman, 98 N.J.L. 743 (E. & A. 1923), the effect of the enactment of the Wartime Prohibition Act upon a contract for the sale of a liquor business was determined. In Nickolopulos v. Lehrer, 132 N.J.L. 461 (E. & A. 1945), the issue related to the consequential effect of certain orders promulgated by the federal authorities upon the obligations of a tenant under the existing lease.
The acknowledgment, however, of the existence of an implied condition has never been ignored in our jurisdiction. Our courts have recognized the principle expressed in Taylor v. Caldwell, 3 B. & S. 826, that "In contracts in which the performance depends on the continued existence of a given person or thing, a condition is implied that the impossibility of performance arising from the perishing of the person or thing" (without the fault of the person against whom the contract is sought to be enforced) "shall excuse the performance." Perlee v. Jeffcott, 89 N.J.L. 34 (Sup. Ct. 1916); Gouled v. Holwitz, 95 N.J.L. 277 (Sup. Ct. 1921); *54 Victory v. Union County Trust Co., 4 N.J. Misc. 908 (Sup. Ct. 1926).
Conditions may be created by the manifested assent of the contracting parties in which circumstances they are classified as express conditions, and there are those which are originated by law by way of implication from the terms, or nature, of the contractual engagement in association with the surrounding facts. The latter are denominated implied or constructive conditions. Restatement, Contracts, sec. 252, 253; 3 Williston on Contracts 1921, sec. 668. The case of Scialli v. Correale, 97 N.J.L. 165 (E. & A. 1922) is a rather interesting portrayal of the shades of distinction.
The principle underlying the most liberal type of an implied or constructive condition said to apply to the present case may be defined as follows: Where in the absence of any express or implied warranty relating thereto the parties from the nature of the contract and the surrounding circumstances must be deemed to have contemplated when entering into the contract the continuing existence of a state of things as the foundation of their mutual obligations, the contract is to be construed as subject to the implied condition that the parties shall be excused in case, before breach, the state of things constituting the fundamental basis of the contract ceases to exist without default of either of the parties.
It would not be veracious to state that our courts unreservedly and unqualifiedly reject the theory of frustration and the legal-factual implication of a constructive condition, but it seems candid to say that in this jurisdiction we have envisioned with some apprehensions the gradual impairment of the obligations of contract which would accompany the progressive expansion of the exonerative effect of such defenses.
Take the present case. Here the claim of the U.E. rests entirely upon the event of the secession of the Local. That occurrence was not an unanticipated, uncontemplated, and adventitious happening unrelated to the deportment of the contracting parties and beyond the control of both. It was *55 occasioned by the action of the Local. Moreover "disbandment, dissolution, secession and disaffiliation of a local" were eventualities the occurrence of any of which was not only contemplated by the parties, but they were events which were made subjects of the express provisions of the contract.
The present action is based upon the terms of the contract applicable to the disaffiliation of the Local, and there is no evidence that a continuance of the affiliation between U.E. and the Local became in fact actually impossible. Indeed, the contractual assent by the Local to the obligation here alleged is not denied, but the supervening event which the Local asserts has caused its liberation from the fulfillment of the obligation is not its secession from U.E. but the severance of the alliance of U.E. with C.I.O. An observance of the certificate of affiliation issued by C.I.O. to U.E. reveals that it contains a provision for its annulment.
To sustain a defense under the doctrine of frustration it does not appear to be sufficient to disclose that the "purpose" or "desired object" of but one of the contracting parties has been frustrated. It is their common object that has to be frustrated, not merely the individual advantage which one party or the other might have achieved from the contract. Hirji Mulji v. Cheong Yue S.S. Co., A.C. 497, 507 (Privy Council 1926); Brown v. Oshiro, 68 Cal. App.2d 393, 156 P.2d 976 (Cal. Dist. Ct. App. 1945).
In the evolution of an implied condition which will nullify a contract it must be evident that the state of "the thing or things" which has been destroyed constituted such an essential and requisite element of the agreement that its destruction or cessation demolishes the attainment of the vital and fundamental purpose of the contracting parties, not merely one or a few of a variety of their purposes. "A promise will not be discharged, however, because the performance promised in return has lost value on account of supervening fortuitous circumstances unless they nearly or quite completely destroy the purpose both parties to the bargain had in mind." 6 Williston on Contracts 5481.
*56 For illustration, a lessee was not discharged from his liability to pay rent pursuant to the terms of a lease of premises "to be used and occupied as a cafe and for no other purpose whatsoever" merely because he was subsequently deprived of their use for the sale of intoxicating liquors for the remainder of the tenancy by reason of the adoption of the Eighteenth Amendment to the Federal Constitution and the enactment of the Volstead Act. Proprietors Realty Co. v. Wohltmann, 95 N.J.L. 303 (Sup. Ct. 1921).
The contractual engagement of a party who was employed as a general manager and secretary of a business which generally consisted in the sale of new and used automobiles was not rendered null by the orders of the Federal Government limiting the opportunities for transactions concerning the sales of motor vehicles. Ryan v. Brown Motors, Inc., 132 N.J.L. 154 (E. & A. 1944).
A case more closely related to the subject implicated in the one sub judice is General Lodge, &c., v. Wieland Lodge, &c., 93 N.J. Eq. 129 (Ch. 1921). There it was made evident that "One of the inducements held out by the officials of the Grand Lodge who organized Wieland Lodge, was that those who joined the lodge might use the German language in the work of the order, and that they might have a ritual printed in German for the conduct of their proceedings." The Grand Lodge subsequently ordained that "after December 31st, 1919, all work and business of such subordinate lodge should be conducted in the English language."
The court recognized that the purpose of the members of the subordinate lodge to use the German language in their proceedings was frustrated but resolved that the subordinate lodge was nevertheless obligated by the terms of the constitution of the parent organization which evidenced the contract of affiliation.
In the reflection of all of the decisions to which reference has been made in this opinion, it is noticed that nowhere has it been judicially declared that a court has the absolving power to let contracting parties loose from their express and *57 implied obligations but that courts under a more modern philosophy may and do exercise the power to infer from the nature and substance of the contract and the surrounding circumstances that a critical and vital condition which is not expressed constituted a foundation on which the parties contracted. We do not believe that the conservative inclinations of our courts heretofore manifested should cause us to disclaim the existence of the last mentioned power in this jurisdiction.
And so, in cases of this assortment the pivotal question is in reality a compound of law and fact. Factually the inquiry relates to the degree of dependency of the attainment of the essential object and purpose of the parties upon the continued existence of the condition. Was the continued existence of the situation that constitutes the condition of the essence of the agreement? We accept the conviction that in cases involving the invocation of such an implied condition the affirmative proof of the condition should be quite clear and convincing.
The determination of that question in the present case necessitates a thorough and discriminative examination of the testimony and of the numerous exhibits.
Initially we discover that many of the exhibits disclose the occurrence of events and activities which took place during a period from one to nine years after the organization of Local 447. In the main those exhibits have little, if any, relevancy to the subject of the inquiry.
The trial judge deemed that his conclusions in the Duris case and the decisions in Clark v. Fitzgerald, 197 Misc. 355, 93 N.Y.S.2d 768 (Sup. Ct. 1949), and in Local 1140 v. United Electrical, Radio & Mach. Wkrs., 45 N.W.2d 408 (Minn. Sup. Ct. 1950) were applicable to the present case. A comparison between the evidence in the Duris case and in the present one distinctly reveals the inequality of the proofs. We shall briefly allude to some significant features of the disparity.
*58 It is stated in the Duris case that:
"In its organizing campaign preceding the formation of Local 441, UE-CIO sought support by virtue of its affiliation with CIO, advertising that affiliation and its ability to protect and advance the interests of the Phelps Dodge employees by drawing on the moneys, personnel, experience and prestige of CIO."
There is no such evidence in the present case. We quote paragraph six of the answer of the defendants to the requests for admissions:
"6. Defendants admit that the Committee of Industrial Organizations did not participate in organizing Local 447 and did not furnish either funds or organizers for the organization of Local 447. * * *"
Another predication appears in the opinion in the Duris case:
"Membership application cards were distributed to the employees of the company prior to the aforesaid election. The union in which the employees accepted membership, according to the designation that appeared on said card was `United Electrical, Radio and Machine Workers of America affiliated with the Congress of Industrial Organizations.' Appeals for membership in the union then seeking to represent the employees were based upon its affiliation with CIO, and membership application cards distributed read `CIO cards.'"
In that particular there is no such evidence in the present suit.
Still another declaration of fact in the Duris opinion reads:
"* * * The flag of the local union received in evidence bears the letters `CIO.' All the stationery, insignia and other printed matter refer to Local 441 as being affiliated with UE-CIO."
We fail to discover any evidence concerning those subjects in the record before us. True, it was stipulated that "at various times and with varying degrees of emphasis and in varying types of publications, stationery and accounting forms, distributed to members, or to the public at large or used in correspondence generally and in relationship to its *59 locals," U.E. used the designation "U.E.-C.I.O." indicating its affiliation with C.I.O. But when with respect to the organization of Local 447? We are not informed. Significantly an affiliation of U.E. with C.I.O. is not mentioned in the charter of Local 447.
Although possible, the contrastive comparison of the evidence in the two cases need not be here extended other than to point out that the court in the cited Minnesota case expressly stated that it decided the case "on facts almost identical with those in" the Duris case.
Assuredly the testimony of the three witnesses called by the defendants was entirely too scanty and inefficient to support the factual basis of the defense here interposed. Concerning one of them the trial judge remarked: "As far as I am concerned there is nothing in the case from Loewenthal of any importance." Another testified as follows:
"Q. In connection with the organizational activities which were mentioned, were there leaflets or other writings issued or distributed? A. Not at first, to my knowledge.
Q. At any time? A. Right before we had the charter, yes, but not before that."
In this memorandum of our deliberation we have endeavored literally to delineate our conception of the principle of law which assumes the name and character of an implied condition justifying the dissolution of a contract and to determine whether the evidence in this particular case brings it within the legitimate scope of the principle. We do not undertake to construct new or amended findings of fact. Our conclusion is that the evidence in the present case is too inadequate to warrant the exonerative application of the acceptable legal principles of the so-called doctrine of frustration or of the cessation of an essential implied condition.
The judgments are reversed.