36 N.J. Super. 53 (1955)
114 A.2d 776
RAYMOND ADAMS, ET ALS., PLAINTIFFS,
v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A PUBLIC UTILITY CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 18, 1955.
*57 Mr. Irving Leuchter for the plaintiffs (Messrs. Kapelsohn, Lerner, Leuchter & Reitman, attorneys).
Mr. Harold A. Price for the defendant (Messrs. Autenrieth & Rochester, attorneys; Mr. Harry Lane, Jr., of counsel).
HALL, J.S.C.
Plaintiffs, who are 161 former employees of defendant in its gas operations, bring suit for severance pay under the provisions of a labor agreement between several locals of the International Brotherhood of Electrical Workers and defendant to the benefits of which plaintiffs were entitled. The amounts of such pay demanded in the complaint aggregate $147,625.13, exclusive of interest and costs. The Appellate Division, in an unreported opinion on an earlier phase of the case held that the controversy was not the subject of arbitration under the agreement.
Defendant now moves for summary judgment and plaintiffs make a cross-motion for judgment interlocutory in character on the issue of liability. R.R. 4:58-3. Voluminous affidavits and other proofs have been submitted by both sides. It is conceded that there is no genuine issue as to any material fact on the overall question of liability.
From the proofs the following pertinent facts are established:
The labor agreement involved was entered into, after a considerable period of negotiation, under date of February 11, 1947, effective as of December 1, 1946, for a period of one year. It contained in section 6.6 these provisions relative to severance pay:
"Severance pay benefits shall be applied as follows:
Regular Employees who have completed one (1) year or more of continuous service and who are permanently released from employment because of reasons beyond the control of the employee concerned, shall be given an allowance of one (1) week's base pay at the rate of pay at the time of release for each full year of continuous service.
Severance pay benefits shall not apply to employees discharged for just cause, resigning (except for bona fide illness in an employee's immediate family requiring a change of location outside the area *58 served by the Company, for reasons of health), retiring, leaving the employ of the Company because of a compensable disability or leave of absence.
The acceptance of a severance allowance shall serve to abolish and annul any and all seniority ratings or reinstatement privileges. Should a separated employee, after having accepted severance pay, as herein provided, be re-employed by the Company, he shall assume the status of a newly hired employee.
Severance benefits shall be in addition to any earned vacation or sick leave benefits for which the separated employee is eligible."
The contract was extended, unchanged as to these provisions, from time to time and was in effect at 12:01 A.M. on June 3, 1952, the date on which plaintiffs' employment with defendant terminated under circumstances claimed to amount to a permanent release "from employment because of reasons beyond the control of the employee concerned" so as to bring the severance pay section into operation. The proofs do not disclose the date of the last extension. The one preceding it was dated August 30, 1950, extending the contract to August 31, 1951. Extensions before that were dated, respectively, August 12, 1947, November 22, 1948, and January 13, 1950.
The defendant, a New Jersey public utility corporation, was engaged up to June 3, 1952 in the manufacture, production and sale of electricity in two disconnected areas in this State and of gas in three such areas, two of which overlapped in whole or in part the electric service areas. The company was, on September 4, 1941, a subsidiary of Associated Gas and Electric Corporation, along with innumerable other utility corporations in this country and the Philippine Islands. The latter and its parent, Associated Gas and Electric Company, were at that time undergoing reorganization pursuant to chapter X of the Federal Bankruptcy Act. On the 1941 date the Securities and Exchange Commission instituted proceedings before it under section 11(b) (1) of the Public Utility Holding Company Act of 1935 (15 U.S.C.A., § 79 et seq.) to compel the divestiture by the parent of many of these subsidiary companies, in whole or in part, as in violation of the provisions of the statute. Included were the gas *59 operations of the defendant. The proceeding was not concluded until December 28, 1951. In the interim, in 1942, after contested hearings, the parent was ordered to sever its relationship with some 115 companies, which it did. Jurisdiction was reserved to determine the extent of the retainable interest in properties controlled by the parent in the New York-Pennsylvania-New Jersey area, including those of defendant, and further hearings held. In 1946, following the completion of the bankruptcy reorganization, the parent changed its name to General Public Utilities Corporation ("General"). Early in 1949, the latter voluntarily agreed to divest itself of its New York subsidiaries, but still insisted on its right to retain the Pennsylvania and New Jersey operations, including all those of defendant. Later that year, the Commission again resumed the hearings on this remaining issue, at which General took the position just indicated and introduced extensive evidence in support thereof. At the conclusion of the hearings early in 1951 the divisional staff of the Commission prosecuting the matter stated its views that General's electric properties in Pennsylvania and New Jersey were retainable as an integrated public utility system, but that the gas properties of defendant were not. General's counsel, on May 2, 1951, stated, apparently because it was felt the Commission itself or an appellate court could not be persuaded to the contrary in the light of decisions in other cases, that it would not oppose the entry of an order embodying those views, and a decision and order to that effect were filed by the Commission on December 28, 1951, which directed among other things that General dispose of its interest in the gas properties of defendant serving Cape May, Ocean, Monmouth and Morris Counties. See In re General Public Utilities Corporation, Securities and Exchange Commission Holding Company Act Release No. 10982.
In anticipation of the final order of the Commission, defendant sought to sell its gas properties, resulting in the execution of a contract of sale therefor, dated December 3, 1951, between it and County Gas Company, the name of which was later changed to New Jersey Natural Gas Company *60 ("New Jersey"). The buyers had no former connection with the seller. The sale was approved by the Securities and Exchange Commission on April 29, 1952 and consummated as of 12:01 A.M. on June 3, 1952. Section 1 of Article IX of this contract contained the only provisions thereof relating to employees of defendant in the gas operations and properties sold, including plaintiffs, and read as follows:
"Seller and Purchaser are desirous that, in the operation of the properties which are the subject of this agreement by Purchaser, Purchaser will endeavor to employ the personnel presently employed by Seller in such operation and Purchaser will endeavor to make due provision therefor. As promptly as practicable Purchaser will advise Seller of any such employees of Seller which Purchaser will be unable thus to employ. Nothing herein set forth shall obligate Seller to release any of its personnel for employment with Purchaser nor to obtain the acceptance, by any of its employees, of employment by Purchaser. Purchaser will give credit under its pension plan to all of Seller's employees transferred to it for all periods of service rendered by such employees to Seller and its predecessors and affiliates as if such service had been rendered to Purchaser, and it is Purchaser's intention that the benefits to be provided under Purchaser's pension plan for the employees thus transferred to it will be substantially comparable to those provided under Seller's pension plan as in force at the date of this agreement."
Neither these employees nor their unions were parties to the agreement in any way. It is to be noted that the quoted section amounts to no more than an expression of desire and intention without any binding commitment for the benefit of the employees concerned by either contracting party.
The proofs do not disclose exactly what transpired between defendant and New Jersey after the execution of the contract of sale with reference to employees of the former, but apparently some kind of an arrangement was made between the companies for New Jersey to take over defendant's employees engaged in the gas operations which it was conducting. Apparently also, certain of defendant's employees who were engaged in both gas and electric operations were given the option of staying with defendant or going with New Jersey. All but two of the plaintiffs are clearly in the former category. These two (plaintiffs Saunders and Wolcott), according to *61 defendant's uncontradicted affidavits, had the option and elected to go with New Jersey.
Under date of May 29, 1952 each employee of defendant who was going into the employ of New Jersey when the sale was consummated received a letter from the president of defendant reading, in part, as follows:
"The sale of our gas property to the New Jersey Natural Gas Company, which has been awaiting approval of governmental agencies for quite some time, has now been approved and consummated. This sale, as you know, is not voluntary on the part of Your Company. It is the result of an Order by the Securities and Exchange Commission that the Company divest itself of its gas properties. It means that 386 Jersey Central employees, who are working in the Gas Department, will be transferred to the new Company as of June 3, 1952 and will no longer be a part of the Jersey Central Power & Light organization.
You are one of these employees to be so transferred and I can truthfully say that I regret that it becomes necessary for you to leave this Company.

* * * * * * * *
You will soon receive compensation covering the redemption of your unused Sick Leave credit which I have agreed to do for all gas employees. You also will be refunded all the money you have contributed to the Additional Allowance provision of our Pension Plan with accumulated interest.
Your new employer has indicated that you will receive from them substantially the same benefits in insurance, pension, sick leave, vacation rights, etc. as you now enjoy and I hope your relationship with them will continue on the same amicable basis as it has with us in the past.
On your leaving the Company, I want again to express my appreciation for your loyal service to this Company in the past and offer you my best wishes for your continued success and happiness in the future."
So, at 12:01 A.M. on June 3, 1952, when the transfer of the gas properties and operations became effective, the plaintiffs became employees of New Jersey, but continued in the same jobs they had formerly held with defendant. On this basis of fact plaintiffs contend that they were permanently released from employment by defendant because of reasons beyond their control and were, therefore, entitled to severance pay on June 3, 1952 in accordance with the provisions of the *62 union contract with defendant, demand for which the latter refused.
Certain happenings subsequent to that date should be noted since they are urged as a basis for some of the defenses.
Within a few days New Jersey sent a letter of welcome to each former employee of defendant now employed by it, agreeing to maintain defendant's wage scale and advising that an interim statement of employee relations and practices would be distributed. The latter shortly followed, in which it was stated:
"2. The New Jersey Natural Gas Company is not, of course, bound by any terms or conditions of existing contracts with the Jersey Central Power & Light Company, but may in certain cases adapt its interim policies to conform to some of the terms of such contracts as applied to employees coming to New Jersey Natural Gas Company from Jersey Central Power & Light Company."
It further indicated that during the interim period personnel matters not covered by the policies detailed in the statement would be handled on a case basis, with action thereon not to be construed as a precedent binding upon the company in establishing its permanent personnel relations program.
New Jersey, at the time of purchase, had a labor agreement with another union. Subsequently, an election was held and the International Brotherhood of Electrical Workers was certified as the bargaining agent for New Jersey's employees. No collective bargaining agreement, however, was entered into for a year. In the meantime, the present controversy between plaintiffs and defendant concerning their right to severance pay had developed and this suit was started on December 3, 1952.
Also during this year's period, some 16 employees of New Jersey who formerly worked for defendant (plaintiffs Albert, Allen, W.T. Bennett, Billings, Edwin Brown, L.W. Brown, Burd, Cobb, Collins, Dailey, Jones, Freeland, McCollum, Moran, Priest and Regina) were released from employment for reasons allegedly beyond their control, and the affidavits indicate that none of them was paid severance pay either by New Jersey or defendant.
*63 The labor agreement entered into with New Jersey, effective July 1, 1953, was by two locals of the International Brotherhood of Electrical Workers, one of which had been a party to the agreement with defendant previously mentioned and the other a new local. That agreement was for a one-year period only, with a provision for automatic renewal from year to year thereafter, unless written notice to terminate or modify was given by either party to the other at least 60 days before the end of the annual period. The severance pay provisions in this contract read as follows:

"Section I
Permanent employees who have completed one year or more of continuous service and who are permanently released from employment because of reasons beyond the control of the employee concerned, shall be given an allowance of one week's pay at the time of release for each full year of continuous service.

Section II
Severance pay benefits shall not apply to employees discharged for just cause, resigning, quitting, retiring on pension from the Company, leaving the employ of the Company because of a compensable disability, or taking leave of absence.

Section III
The acceptance of a severance allowance from the Company shall serve to abolish and annul any and all seniority ratings or reinstatement privileges. Should a separated employee, after having accepted severance pay, as herein provided, be re-employed by the Company, he shall assume the status of a probationary employee.

Section IV
Severance benefits shall be in addition to any earned vacation or sick leave benefits for which the separated employee is eligible.

Section V
Employees who receive a pension from another company by reason of previous employment shall be entitled to severance pay from this Company based only upon the period of continuous service with this Company."
Another provision of that contract should be noted. This related to seniority and provided:
"Each employee shall have a single seniority date and shall be that date appearing on the Company's official seniority list." *64 It is undisputed that New Jersey's official seniority list sets forth as the seniority date of each former employee of defendant the date when his employment commenced with the latter company, although there appears to be no provision in the union agreement with New Jersey so requiring.
After the effective date of this labor agreement and in the latter part of 1953, two other employees of New Jersey who formerly worked for defendant (plaintiffs Dubinko and Regelski) were released from employment for reasons beyond their control. Apparently, there had been some discussions between the union and New Jersey prior to this event concerning whether New Jersey was bound under its labor agreement to compute severance pay based on total service with defendant and it with respect to employees who had formerly worked for defendant, but no definite conclusion had been reached. On November 13, 1953 the international representative of the union wrote New Jersey setting forth the union's position to the effect that defendant was primarily liable for severance pay to its former employees now working for New Jersey, which was claimed to be due on June 3, 1952, but that any such employee who did not recover such in the pending litigation was entitled to severance pay from New Jersey at the time of his termination of employment by it covering not only his service with that company, but with defendant. Thereafter, in December 1953, these two plaintiffs were paid severance pay by New Jersey based upon not only service with it, but also on prior employment by defendant. There is no proof of any agreement between the two companies concerning these payments or any other severance pay claims.
Clear understanding of the exact provisions of the severance pay section is essential in determining the legal issues presented. Its benefits are given to employees "permanently released from employment" where such release is "because of reasons beyond the control of the employee concerned." The primary criterion is loss of employment through some act of the employer, without fault or affirmative act on the part of the employee. Then follows a list of specific *65 exceptions setting forth situations in which the benefits are not payable: (a) discharge for just cause; (b) resigning; (c) retiring; (d) leaving the employ of the company because of a compensable disability; and (e) leave of absence. These exceptions, it will be noted, cover cases of termination of employment resulting from the voluntary affirmative act of the employee or following some conduct of his or brought about by his age or physical condition, the circumstances of which might otherwise possibly be construed to constitute a release for a reason beyond his control. The resignation exception is qualified so that in the one situation of voluntary act of the employee caused by family illness requiring a change of location for reasons of health, the circumstances are still to be considered as beyond the control of the employee.
Basically, we are concerned with this relatively simple contract between the parties  its meaning and application in the light of the undisputed facts. (There is no contention in the case that the provision is a purely gratuitous one and not supported by good consideration.) If these facts bring plaintiff within its plain terms  for there is nothing ambiguous about it  they are entitled to recover unless the circumstances and rules of law said to be applicable by reason thereof require additional provisions and exceptions to be read into and become an effective part of it as a matter of law.
It seems almost beyond question that plaintiffs were "permanently released from employment" by defendant. The letter of May 29, 1952, even if it be considered only an epistle of friendly farewell, made it plain to them that defendant no longer had work for them to do because it had sold that portion of its business in which they were employed and that they must leave the company. The sale or other termination of an enterprise, no matter for what reason or by what mechanics, ends the employment and severs the relationship of master and servant, for the employer is no longer able to perform his part of the employment contract whether it be for a fixed term or not. White v. Lumiere North American Co., 79 Vt. 206, 64 A. 1121, 6 L.R.A., N.S., 807 (1906); Matthews v. Minnesota Tribune Co., 215 *66 Minn. 369, 10 N.W.2d 230, 147 A.L.R. 147 (Sup. Ct. 1943) (a severance pay case); Gaspar v. United Milk Producers, 62 Cal. App.2d 526, 144 P.2d 867 (D. Ct. App. 1944); Montefalcone v. Banco Di Napoli Trust Co., 268 App. Div. 636, 52 N.Y.S.2d 655 (App. Div. 1945) (a severance pay case); In re Public Ledger, 161 F.2d 762 (3 Cir., 1947) (a severance pay case). Cf. Armstrong v. Cherry, 89 Cal. App. 442, 264 P. 798 (D. Ct. App. 1928).
No precise formality of notice or magic of exact language is necessary to constitute a dismissal or release. Any words or acts of the master which show a clear intention to dispense with the employee's services are enough. 56 C.J.S., Master and Servant, § 41, p. 426; Matthews v. Minnesota Tribune Co., supra. See Diffley v. Jacobson Manufacturing Co., 6 N.J. Misc. 1044 (Sup. Ct. 1928), affirmed 105 N.J.L. 631 (E. & A. 1929). The May 29 letter, even if it was not preceded by earlier notice or information of some kind, which it is difficult to believe, was sufficient for the purpose.
Defendant argues that what happened to plaintiffs was not a release from employment but merely a transfer of employers without a single hour's loss of pay or change of job or work location. This is factually true; it is equally true that they could no longer work for defendant with which they had the contract. It was fortuitous that New Jersey was willing to accept plaintiffs' services and that defendant was willing to make a successful effort to place them there. Plaintiffs were in no way bound to work for New Jersey. They could not continue in defendant's employ even if they wished. Their choice was to become an employee of New Jersey or seek work elsewhere. Legally, the situation in this respect is no different than if New Jersey had been unwilling to take over these workmen and defendant, in fulfillment of a commendable feeling of moral or social obligation, had secured satisfactory employment for them with some third party in the same or a different line of business without loss of time or wages. In such case, could there be any doubt of the right to collect severance pay unless a further exception *67 is to be judicially written into the contract that its benefits are not available unless actually unemployment and financial loss result?
There can be no doubt that the termination of employment was for "reasons beyond the control of the employee" within the meaning of this broad phrase. Plaintiffs had nothing whatever to do with the sale of the gas properties and operations or the reasons for it. Defendant suggests, however, that the exception of discharge "for just cause" applies because of the alleged involuntary nature of the sale, which is next considered.
It is, of course, true that the sale to this particular buyer was voluntary in the sense that the Securities and Exchange Commission did not order defendant to convey to New Jersey. Its order was simply for divestment of the gas properties. The chronology of events leading to the edict requiring the sale, however, constituted the latter as involuntary in fact and law. Defendant, through its parent, vigorously fought the proceeding for years. It did not bow until it knew what the final recommendation of the division of the Commission would be and was satisfied that it had no chance of overturning it even in the courts. Plaintiffs urge the disposition must be considered voluntary because the struggle was not carried on to the last possible tribunal. Continued futile expenditure of time and money when the end result seemed obvious should not be required before it can properly and conclusively be said that the corporation was disposing of its gas properties against its will. However, this conclusion does not aid defendant.
Defendant urges that plaintiffs' discharges were "for just cause," but offers no authority to support the statement. It points to section 3.1 of the labor agreement, reserving to it the "sole and exclusive right to hire, transfer, reassign or release employees for just cause." Concerned here is not the right of the employer to release or discharge an employee, but whether such termination of employment gives a right to severance pay. If defendant's contention were to prevail, many other circumstances constituting justifiable cause for *68 release might equally result in a denial of severance pay, e.g., dismissal for lack of business, introduction of improved methods of operation or mechanization, competition from other kinds of fuel and the like. The severance pay provision would thereby be rendered of little value or benefit. It might well be said that if such reasoning were followed a further exception would be read into the contract that severance pay is not payable where the reason for release was beyond the control of the employer. It is clear that "discharge for just cause" applies only where the employer has the right to dismiss for misconduct or dereliction of the employee. Sale or termination of a business does not constitute such a discharge. See Hudson County Newspaper Guild v. Jersey Publishing Co., 23 N.J. Super. 419 (App. Div. 1952); In re Public Ledger, supra.
Defendant next contends that the involuntary nature of the sale rendered the continuance of plaintiffs' employment impossible and therefore excused its obligation to pay severance benefits on the theory of legal impossibility. While such circumstances might excuse performance of an employment contract for a fixed term on the ground of impossibility, it must be remembered that this is not an action for breach of an agreement to employ. Disposition of the business requiring termination of employment does not make impossible, factually or legally, performance of an obligation dependent upon termination itself. The same argument was rejected by the Appellate Division of New York in Montefalcone v. Banco Di Napoli Trust Co., supra, where the plaintiff's employment in a bank was terminated by reason of the state banking authorities taking over the institution for liquidation.
A companion argument is advanced that performance is excused because the circumstances of the termination of plaintiff's employment with defendant were not within the reasonable contemplation of the parties at the time the contract was made and therefore a condition or exception must be implied and judicially written into the agreement to the effect that severance pay is not due in the situation here present. The basis of the argument is two-pronged: one, *69 again the involuntary nature of the sale of the business irrespective of what happened to the dismissed employees thereafter; and second, the fact that plaintiffs suffered no unemployment, loss of wages or seniority rights because of continuance in work by the purchaser.
It is a long-established rule of the law of contracts that performance will not be excused merely because of the occurrence of an unexpected contingency or circumstance not provided for in the agreement. An early leading case is Superintendent and Trustees of Public Schools of City of Trenton v. Bennett, 27 N.J.L. 513 (Sup. Ct. 1859), where the principle was laid down in this language:
"* * * where a party, by his own contract, creates a duty or charge upon himself, he is bound to make it good if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract; * * *." (27 N.J.L., at page 517.)
"He that agrees to do an act should do it, unless absolutely impossible. He should provide against contingencies in his contract. Where one of two innocent persons must sustain a loss, the law casts it upon him who has agreed to sustain it, or rather the law leaves it where the agreement of the parties has put it; the law will not insert, for the benefit of one of the parties, by construction, an exception which the parties have not, either by design or neglect, inserted in their engagement." (27 N.J.L., at page 519.)
Recent developments have introduced into the law a modification of this rule, in certain instances, which has come to be called the doctrines of implied condition and frustration of purpose, thoroughly discussed in the light of the authorities in this State and elsewhere, by Judge Jayne in Edwards v. Leopoldi, 20 N.J. Super. 43 (App. Div. 1952), certif. denied 10 N.J. 347 (1952). Cf. Duff v. Trenton Beverage Co., 4 N.J. 595 (1950).
Judge Jayne concludes that these doctrines are to be accorded recognition in this State to ground excuse for contractual performance in situations coming within their scope:
"In the reflection of all of the decisions to which reference has been made in this opinion, it is noticed that nowhere has it been *70 judicially declared that court has the absolving power to let contracting parties loose from their express and implied obligations but that courts under a more modern philosophy may and do exercise the power to infer from the nature and substance of the contract and the surrounding circumstances that a critical and vital condition which is not expressed constituted a foundation on which the parties contracted. We do not believe that the conservative inclinations of our courts heretofore manifested should cause us to disclaim the existence of the last mentioned power in this jurisdiction." (20 N.J. Super., at page 56.)
It is these doctrines which defendant seeks to apply to excuse its performance. Initially it is to be observed that the question of applicability is a mixed question of law and fact. The evidence must be clear, convincing and adequate. Relief from performance of contractual obligations on this theory will not be lightly granted. Edwards v. Leopoldi, supra. See 7 Rutgers L. Rev. 139. Moreover, the mere fact that a collective bargaining agreement is involved does not justify special treatment or a departure from established principles in this case, either at the suggestion of employer or employee, despite recent suggestions that such contracts might, in some respects, well be considered sui generis. See Kennedy v. Westinghouse Electric Corp., 16 N.J. 280, 284-287 (1954).
So defendant contends that its continuance of the gas business, or to put it more correctly in the negative, that it would not be involuntarily compelled to sell it, was an implied condition of the obligation to pay severance benefits which was in the minds of both parties when the agreement was originally entered into and on each occasion when it was renewed. The evidence does not bear out the contention. As has been pointed out, the Securities and Exchange Commission had reserved hearings seeking the compulsory divestment by General of its Pennsylvania and New Jersey properties in 1949 which continued until early in 1951. In May of that year General advised the commission it would not oppose any order requiring it to dispose of these properties. Two extensions of the collective bargaining agreement took place after the hearings were resumed and the last one must *71 have occurred after May 1951. Defendant certainly knew at that time not only of the possibility, but in fact of the actuality, of a forced sale of its gas business in the near future. Whether its gas employees were likewise cognizant is not shown, but even if they were, such knowledge is not material. Defendant, with its knowledge, might well have insisted, if it so desired, on an inclusion of a provision in the severance pay section at the time of the last contract extension that it should not be applicable in the event of an involuntary disposition of the business and immediate reemployment of the beneficiaries by the buyer. It did not do so and cannot now urge the unprovided-for contingency as an excuse for performance.
The same line of reasoning is advanced in advocacy of an implied condition of unemployment by the discharged employee before severance pay is due, especially in the instant circumstances. Reference is sought to be made to the negotiations for the original labor contract and what was then discussed as the purpose of the provision. Consideration of such evidence would clearly appear to be a violation of the parol evidence rule, there being no ambiguity in the clause. The agreement language makes no reference whatever to the necessity of unemployment as a prerequisite.
In support of the argument resort is had to judicial expressions of the purpose of severance pay as "to tide over a dismissed employee between jobs," i.e., contractual unemployment insurance benefits. See Hudson County Newspaper Guild v. Jersey Publishing Co., supra. This may be one, but certainly not its only purpose. But dismissal pay has also been spoken of as earned compensation for past services rendered. This theoretical designation of purpose has been soundly criticized, for if such were the basis, it should be payable, for example, on the death of an employee as well as upon the termination of his employment without fault. Ackerson v. Western Union Telegraph Co., 234 Minn. 271, 48 N.W.2d 338, 25 A.L.R.2d 1063 (Sup. Ct. 1951). See Owens v. Press Publishing Co., 34 N.J. Super. 203, 208 (Law Div. 1955). Other reasons or bases have been suggested *72 and are fully discussed in the Ackerson case, in which the unemployment compensation theory was rejected.
However, it is unnecessary to consider further or decide the philosophy of severance pay. Here we have a plain contractual provision. The employer was obviously willing, for reasons which it must have considered of benefit to it, to agree to pay with no strings attached except such as are carefully set forth in the agreement itself. Were its theory of an implied condition of resulting unemployment to be read into the contract generally, the subsequent circumstance of each individual discharged employee would have to be examined to determine whether he was eligible for such benefits and, if so, to what extent. This obviously was not the intention of the parties. An analogous factual situation is found in Matthews v. Minnesota Tribune Co., supra, in which severance benefits were held due where an employee continued work for the purchaser of a business at voluntary sale on the same job at the same salary. That decision supports the rejection of defendant's contention.
Defendant also urges it is relieved from liability because New Jersey assumed the obligation to pay plaintiffs severance pay, if their employment was later terminated by it, on the basis of combined service with defendant and it. If a novation is urged as the foundation for the argument, agreement thereto by all three parties concerned is necessary and there is absolutely no evidence of any such undertaking. Indeed, the record is barren of any obligation by New Jersey, even to defendant, to pay severance pay to the latter's former employees.
Reliance for its argument is apparently placed by defendant primarily on the labor agreement between New Jersey and the bargaining agent for its employees entered into July 1, 1953, almost a year after the sale. (It is to be recalled that in the interim the employment of 16 former employees of defendant was terminated by New Jersey and they received no severance pay from either company.) Even assuming that this contract required New Jersey to pay severance benefits based on combined service to the two companies, *73 which it seems clear it did not, such an undertaking would not, under fundamental principles relieve defendant of its prior primary obligation. In fact, New Jersey's labor agreement, set forth earlier herein at length, did not obligate it to make severance payments computed on combined service. It is, by its terms, based on "continuous service" which is nowhere defined or implied to be other than service with the contracting party (New Jersey) only. Moreover, some details of the provision are not as beneficial to the employee as defendant's contract. Significantly, too, the agreement was only for a one-year period and the severance pay section might well not appear in the same language, or at all, in subsequent annual agreements. The fact that New Jersey actually did pay severance compensation to two employees, discharged after July 1, 1953, on the basis of combined service does not aid defendant. New Jersey could, of course, pay on that basis if it desired to, but it was not bound to do so in these cases or in future instances. The only effect of such payment is to bar those plaintiffs from recovery here against defendant for they are not entitled to double payment.
Defendant also makes much of the fact that plaintiffs' seniority date with New Jersey is in fact the date of the individual's commencement of employment with defendant. But seniority rights and the date of computation thereof are not necessarily legally the same thing as the date for computation in severance pay provisions. New Jersey's labor contract does not in fact make them identical. Seniority has other distinct purposes, especially for the purpose of basing the order of promotions or discharge. It was distinctly to New Jersey's advantage to use the date of original employment with defendant as the seniority date of the employee; otherwise it would have a very large number of employees with the single seniority date of June 3, 1952, thereby rendering the application of seniority in the future practically impossible.
Finally, defendant urges that conduct of the plaintiffs or their union representative subsequent to the sale bars recovery on the grounds of abandonment, waiver, estoppel, or *74 accord and satisfaction. It is unnecessary to review these arguments in detail, for it is apparent they are without merit. Plaintiffs and their representatives did nothing more than to make every effort to assure they would be paid severance benefits by someone on the basis of their original contract with defendant.
Plaintiffs Saunders and Wolcott are not entitled to recover since they had the option to remain with defendant and so were not released from employment within the meaning of the severance pay provision. Plaintiffs Dubinko and Regelski are likewise not entitled to recover because they have been paid benefits by New Jersey based on total employment with both companies. Defendant's motion for summary judgment is, therefore, granted as to these four plaintiffs and denied as to all other plaintiffs.
Plaintiffs' cross-motion for judgment interlocutory in character on the issue of liability (R.R. 4:58-3) is granted as to all plaintiffs except the four above named.
Since plaintiffs prevailed in overwhelming part, costs will be allowed the successful plaintiffs on the granting of their motion and the denial of that of defendant. N.J.S. 2A:15-59; R.R. 4:55-6(a).
An order may be presented in accordance with these conclusions.