**ATLANTIC COAST DEMOLITION AND RECYCLING, INC., et al., Plaintiffs,**

v.

**BOARD OF CHOSEN FREEHOLDERS OF ATLANTIC COUNTY, et al., Defendants.**

Civil Action Nos. 93–2669 (JEI), 94–3244(JEI) (Consolidated Actions).

United States District Court, D. New Jersey.

Dec. 18, 1997.

Sinisi, Van Dam, Sproviero & Sokolich by Stephen P. Sinisi, Scott G. Sproviero, Paramus, NJ, for Bergen County Utilities Authority.

Bivona, Cohen, Kunzman, Coley, Yospin, Bernstein & Difrancesco by Steven A. Kunzman, Patrice M. Rodman, Warren, NJ, for Union County Utilities Authority.

### OPINION

IRENAS, District Judge.

Presently before the Court is the application of the Bergen County Utilities Authorities ("BCUA"), one of the defendants in this action, requesting us to exercise our power under the Anti–Injunction Act, 28 U.S.C. § 2283, and the All Writs Act, 28 U.S.C. § 1651, and assume jurisdiction over a state contract dispute between it and the Union County Utilities Authority ("UCUA"), a non-party to this action.

In *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County* ("*Atlantic Coast II*"), 112 F.3d 652 (3d Cir.1997), the Third Circuit held that New Jersey's flow control statutes governing the disposal of locally generated waste violated the dormant Commerce Clause. Prior to the decision in *Atlantic Coast II*, BCUA entered a long term "put or pay" contract to dispose of its waste at a facility operated by UCUA. This contract was negotiated, entered into and approved by the State of New Jersey under the now unconstitutional regulatory scheme which excluded out-of-state fa-

cilities from consideration as possible sites for disposal of Bergen County's waste. It is one of many contracts entered into prior to November 10, 1997, the effective date of the *Atlantic Coast II* injunction, with executory obligations which continue into the future.

There is no doubt that if the BCUA/UCUA contract was negotiated today under state mandated rules which barred competition from out-of-state entities, such contracts would be unenforceable and in violation of the *Atlantic Coast II* injunction. BCUA carries this premise one step further and argues that the *Atlantic Coast II* injunction operates to abrogate the remaining executory portions of the contract and that, as a result, this court should assume jurisdiction over the suit instituted in the Superior Court of New Jersey by UCUA for a declaration of the contract's validity. Because we find that a resolution of this issue requires us to consider both the retroactive application of the *Atlantic Coast II* injunction to conduct which occurred before the injunction became effective, *see James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991); *Harper v. Virginia Department of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); *Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995), and the possible modification of the remedy provided by the injunction, *see Hyde,* 514 U.S. at 759, 115 S.Ct. at 1751, *Atlantic Coast II,* 112 F.3d at 672, *before* any state law issue even becomes relevant to the inquiry, and because these decisions respecting the scope and temporal reach of the injunction may affect many other contracts, we will assume jurisdiction in this matter "to protect and effectuate" the *Atlantic Coast II* injunction. Anti–Injunction Act, 28 U.S.C. § 2283, *see* All Writs Act, 28 U.S.C. § 165.

## I. BACKGROUND

### A. *The Interdistrict Agreement*

In 1990, the UCUA contracted with Ogden Martin Systems of Union, Inc. for the construction and long-term operation of the Union County Resource Recovery Facility ("UCRRF"). The UCRRF was to be located in Rahway, New Jersey. The proposed UCRRF had the capacity to process an amount of waste well in excess of the amount of processible waste currently generated within the boundaries of Union County. Thus, UCUA sought a regional partner to help in constructing and operating the facility and to commit to sending waste to the UCRRF to ensure its operation at capacity.

At this same time, having decided not to construct its own resource recovery facility, the BCUA sought to enter into an agreement with a regional resource recovery facility in order to meet the disposal needs of Bergen County. BCUA began negotiating for an agreement to utilize the Essex County Resource Recovery Facility. However, these negotiations eventually broke down. BCUA and UCUA then commenced negotiations for Bergen's participation in the UCRRF construction and operation.

On October 24, 1991, the BCUA and UCUA entered into a Memorandum of Understanding ("MOU") which evidenced intent of the parties to enter into an interdistrict agreement under which the UCUA would provide certain services for the processing of solid waste generated within Bergen County and, in return, the BCUA would join the UCUA in its efforts to construct and operate the UCRRF.

The MOU contained a "put or pay" provision which read:

> The fees payable by the BCUA are an unconditional obligation and shall be payable by the BCUA whether or not the BCUA actually meets its delivery obligations of the minimum tonnage specified in Article 1.

In April 1993, the UCUA and BCUA entered into the Interdistrict Agreement which effectuated the terms of the MOU. The Interdistrict Agreement was amended on August 25, 1993. The Amended and Restated Interdistrict Agreement ("Agreement") superceded and replaced the MOU and the April agreement. The Agreement is the subject of pending litigation in the Union County Superior Court.

The Agreement also contains a "put or pay" provision, mirroring the one contained in the MOU, which requires the BCUA to

deliver 192,000 tons of Bergen processible waste to the facility each service year, or to make a payment on a monthly basis. Payments are to be made in accordance with Section 5.07 of the Agreement, which provides:

> The payment obligation of the BCUA ... shall be an unconditional obligation to pay and shall continue and not be interrupted during any period that the UCUA's payment obligations continue to be payable and the BCUA shall not be relieved of such payment obligations for any reason, including, but not limited to, any Uncontrollable Circumstance, any failure of the Facility to operate or any failure of the BCUA to deliver Bergen Processible Waste to the Facility.

The Agreement defines "Uncontrollable Circumstance" as

> [A]ny act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon thereon as justification for failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this agreement. Such acts, events or conditions shall include, but not be limited to the following: ... any Change in Law ....

Change in Law is defined as:

> [A] change in any Applicable Law, including, but not limited to: (a) the adoption, promulgation, issuance, modification or change in administrative or judicial interpretation of any Applicable Law; (b) the order or judgment of any federal, state or local court, administrative agency or governmental officer or body; and (c) the denial of an application for, delay in review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the renewal or failure of renewal of any governmental permit, license, consent, authorization or approval.

Section 7.03 of the Agreement states:

> The parties hereto acknowledge that notwithstanding any Uncontrollable Circumstance, all payment obligations shall continue to be performed, including but not limited to those payments which may be attributable to amounts due on Facility Bonds.

### B. *The Atlantic Coast Decision*

Nearly a year and a half ago, we held that New Jersey's flow control laws, which require waste management districts to contract with designated waste facilities for disposal of locally generated waste, were unconstitutional. *Atlantic Coast Demolition & Recycling v. Board of Chosen Freeholders of Atlantic County*, 931 F.Supp. 341 (D.N.J.1996). We found that New Jersey's policy of self-sufficiency, which favors the designation of in-state waste facilities over those located out-of-state, violated the dormant Commerce Clause of the United States Constitution. Upon finding New Jersey's flow control laws unconstitutional, we granted a permanent injunction against the enforcement of flow control. However, because we believed that our injunction would cause serious disruption and financial harm to the state and citizens of New Jersey, we issued a two-year post appeal stay of the permanent injunction. BCUA was a party to this matter but UCUA was not.

On May 1, 1997, the Third Circuit affirmed our holding that New Jersey's policy of self-sufficiency violated the dormant Commerce Clause. *Atlantic Coast II*, 112 F.3d 652 (3d Cir.1997). However, the Third Circuit reversed our two-year post appeal stay, finding that we had erred in delaying the injunction of an unconstitutional law. Thus, the Court ordered that the injunction of the enforcement of New Jersey's waste flow directives, N.J.A.C. 7:26–6.5, would become effective upon the "denial of petitions for certiorari by the Supreme Court of the United States." *Id.* at 673. As a result of the Third Circuit's decision, we then modified our injunction on May 7, 1997. The Order we entered precisely mirrored that of the Third Circuit.

The Order enjoins Utility Authorities "from enforcing those provisions of New Jersey Administrative Code 7:26–6.5 which, by designating in-state facilities as the sole pro-

viders of disposal and processing services, discriminate against out-of-state operators of waste disposal." It orders that "[i]nsofar as the defendants must select and contract with waste disposal facilities pursuant to N.J.A.C. 7:26–6.6 and 6.7 in order to comply with the provisions of ... [the Court's] injunction, they are permanently enjoined from implementing New Jersey's self-sufficiency policy as mandated under the State plan by abrogating existing valid contracts or rejecting or foreshortening contracts submitted to the New Jersey Department of Environmental Protection for review."

The Supreme Court denied certiorari in this case on November 10, 1997. Therefore, the injunction of the enforcement of N.J.A.C. 7:26–6.5 has now become effective.

On December 8, 1997, in a related case in this matter, the Third Circuit held that this Court has jurisdiction over the *Atlantic Coast II* injunction. *Atlantic Coast II*, D.C. Civ. A. Nos. 93–2669 & 94–3244, Slip. Op. (3d Cir. Dec. 8, 1997). Thus, we have now been entrusted to address issues arising as a result of the resolution of this long, protracted litigation.

### C. Scope of the Injunction

In striking down New Jersey's restrictions barring competition from out-of-state facilities and operators, the Third Circuit was careful to limit its finding of unconstitutionality to N.J.A.C. 7:26–6.5 and to set forth substantial areas of regulatory activity which are not constitutionally impermissible. The Court held that New Jersey:

> can no longer implement its self-sufficiency policy—either formally or informally—by rejecting or hindering contracts between waste management districts and out-of-state facilities or operators.

*Atlantic Coast II,* 112 F.3d at 668.

The Court specifically noted that its injunction against the enforcement of N.J.A.C. 7:26–6.5 "leaves the bulk of New Jersey's waste disposal system in place," *id.* at 670, and "does not bar the enforcement of the State's remaining portions of either [the Solid Waste Utility Control Act, N.J.S.A. 48:13A–1 et seq. or the Solid Waste Manage-

ment Act, N.J.S.A. 13:1E–1 et seq.]." *Id.* at 668. It further stated:

> [I]f the process for selecting waste disposal facilities no longer discriminates against interstate commerce, neither will the regulatory provisions enforcing such a non-discriminatory system. Although the State of New Jersey may no longer preclude the designation of out-of-state waste disposal facilities or operators, the State and the County Authorities remain free to regulate the flow of waste within New Jersey so long as the State's laws and regulations treat in-state and out-of-state facilities equally.

*Id.*

Thus, it became incumbent upon the waste utility authorities in New Jersey to "modify their waste disposal plans and choose new facilities to service their needs in a non-discriminatory fashion." *Id.* at 670. BCUA argues that, in order to modify its waste disposal plan to meet the mandate of *Atlantic Coast II*, it must be permitted to abrogate the Agreement with UCUA. UCUA, to the contrary, claims that the terms of the Agreement specifically prohibit BCUA from terminating the contract in its entirety. They allege that the payment obligations of BCUA remain unscathed by the *Atlantic Coast II* Order.

### D. The UCUA/BCUA State Court Action

UCUA has instituted a state court action in the Union County Superior Court to determine whether BCUA may terminate the Agreement. UCUA maintains the state court has jurisdiction over its case because the issues to be decided all hinge on state contract law. Judge Boyle of the Superior Court has entered a temporary restraining order in favor of the UCUA which states that:

> The Defendant BCUA is hereby temporarily restrained as of November 12, 1997 ... from terminating payments to the UCUA in the amounts required by [the Agreement]. . . .

In an amended order, Judge Boyle has issued to BCUA an order to show cause:

why an order should not be granted in favor of the UCUA requiring the BCUA to continue to make the minimum required deliveries of solid waste to the [UCRRF] or pay for such minimum deliveries in accordance with the [Agreement] and/or, alternatively, make payments to the UCUA arising from the [Agreement], and why an order should not be entered enjoining defendants from taking further action to amend [their solid waste disposal plan] in a manner inconsistent with the obligations pursuant to and/or arising from the [Agreement] and for the continuation of the restraints imposed by the Court until final disposition of this matter or further Order to Show Cause.

The scheduling of the return date of any briefs in response to Judge Boyle's Order to Show Cause has been held in abeyance pending our decision in this matter.

BCUA believes that Judge Boyle's temporary restraining order, as well as any permanent injunction which he might issue, threatens the Order and decision in *Atlantic Coast II*. It asks us to use our power pursuant to the Anti–Injunction Act and the All Writs Act to enjoin any further proceedings before Judge Boyle and to assume jurisdiction over this dispute ourselves.

## II. DISCUSSION

The question of whether to stay the proceedings in a state court is never one to be taken lightly, as it impinges on the very delicate balance struck between the federal and state judicial systems. However, the Supreme Court has recognized that in certain situations some federal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case. *See Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970). Federal courts are expressly prohibited from issuing injunctions against state court actions under the Anti–Injunction Act, 28 U.S.C. § 2283, except under certain limited circumstances. The statute reads:

A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

■ The purpose of this statute is to recognize the "fundamental constitutional independence of the states and their courts" and "to prevent needless friction between them and the federal courts." *Atlantic Coast Line R.R. Co.*, 398 U.S. at 287, 90 S.Ct at 1743; *see Vendo Co. v. Lektro–Vend Corp.*, 433 U.S. 623, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977); *Oklahoma Packing Co. v. Oklahoma Gas & Elec. Co.*, 309 U.S. 4, 9, 60 S.Ct. 215, 218, 84 L.Ed. 537 (1940); *Leiter Minerals, Inc. v. United States*, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957). Thus, this Court may not enjoin any portion of the New Jersey proceeding or the parties to it unless our order falls within one of the three exceptions of the Anti–Injunction Act.

■ BCUA argues that this Court should issue an injunction against the New Jersey Superior Court action because, under the third exception to the Anti–Injunction Act, it is necessary in order to protect or effectuate this Court's judgments. Alternatively, BCUA argues that this Court is justified in issuing a stay under the All Writs Act, 28 U.S.C. § 1651. That statute reads, in relevant part:

The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

The two statutes are closely related, and "section 2283 must be construed in connection with section 1651." *Olin Corp. v. Insurance Co. of North America*, 807 F.Supp. 1143 (S.D.N.Y.1992); *Baker v. Gotz*, 415 F.Supp. 1243, 1247 (D.Del.1976). Furthermore, courts have held that where an injunction is proper in order to protect or effectuate the judgments of a federal court, it is within that court's power to issue the injunction under the All Writs Act, even though the language of that statute only expressly refers to "aid of … jurisdiction[ ]." *Ward v. Pennsylvania*

*New York Central Transportation Co.,* 456 F.2d 1046, 1048 (2d Cir.1972).

■ We recognize that the exceptions to the Anti–Injunction Act must be narrowly construed *See 1975 Salaried Retirement Plan v. Nobers,* 968 F.2d 401 (3d Cir.1992); *Atlantic Coast Line R.R. Co.,* 398 U.S. at 297, 90 S.Ct. at 1748, and that the Court should exercise its All–Writs powers only under exceptional circumstances. *See Pan Atlantic v. Republic Ins. Co.,* 878 F.Supp. 630, 643–44 (S.D.N.Y.1995). Nonetheless, under the unique circumstances of this case and the analytical sequence through which it must necessarily be decided, we have no choice but to utilize our power under the Anti–Injunction Act and the All–Writs Act to remove, at least for initial analysis, the state UCUA/BCUA dispute to this Court.

The issues raised by UCUA in its state court action must be decided under a two-pronged sequence of analysis. First, it must be determined whether or not the decisions and injunction in *Atlantic Coast II* relate back in time to retroactively void the Agreement. In order to determine *Atlantic Coast II*'s retroactive effect, a court must (1) interpret, as a substantive matter, whether the injunction mandates abrogation of contracts that, if entered into today, would be clearly illegal, *see Beam,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481; *Harper,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74; *Hyde,* 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820, and (2) decide, as a remedial matter, whether a modification of the injunction is appropriate. *See Hyde,* 514 U.S. at 759, 115 S.Ct. at 1751; *Atlantic Coast II,* 112 F.3d at 672. These are purely questions of federal law and ones which require this Court to revisit in depth issues it has been struggling with since the inception of this litigation. Second, and only if the analysis under federal law does not lead to an invalidation of the Agreement, a court must decide the state contract issues implicated by the UCUA/BCUA dispute.

Because analysis under the first prong requires (1) an interpretation of the injunction and its retroactive application and (2) potentially a modification of the remedy provided in *Atlantic Coast II, see Beam, Harper* and *Hyde,* this Court must be the one to under-

take it. If the state court were to undertake this analysis it would threaten our jurisdiction over and the effectuation of the *Atlantic Coast II* injunction. Thus, we shall exercise out powers under the Anti–Injunction Act and the All Writs Act in order to undertake the analysis required under the first prong. Then, if we find that the Agreement has not be rendered null and void as a result of *Atlantic Coast II,* we will remand the case back to state court for interpretation of the remaining state law issues.

### A. The Rule of Retroactivity

Prior to the recent Supreme Court cases analyzing the rule of retroactivity, the leading case was *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). *Chevron Oil* set forth a three-part test for determining whether or not a judicial mandate has a retroactive effect: (1) whether the decision announced a new principle of law; (2) whether non-retroactive application would undermine the purpose of that decision; and (3) whether retroactive application would work a significant inequity. *Id.* at 106–108, 92 S.Ct. at 355–356. Thus, *Chevron Oil* provided several exceptions to the rule of retroactive application. Under the inequity exception, reliance upon a prior decision was often held adequate to bar a new decision form being applied retroactively. Recently, however, the exceptions of *Chevron Oil,* in particular the notion that inequity caused by reliance permits an escape from the retroactive application of a new rule of law, have been refined and tightened by the Supreme Court.

The first Supreme Court case to revisit the *Chevron Oil* exceptions was *Beam,* 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481. In *Beam,* the Court considered whether a rule of law newly announced in a judicial decision must be applied retroactively "to claims arising on facts antedating that decision." *Id.* at 532, 111 S.Ct. at 2441. Justice Souter concluded that selective retroactivity "breaches the principle that litigants in similar situations should be treated the same, a fundamental component of stare decisis and the rule of law generally." *Id.* at 537–38, 111 S.Ct. at 2444. He reasoned that "the nature

of precedent, as a necessary component of any system that aspires to fairness and equality," dictates that "when the Court has applied a rule of law to the litigants in one case it must do so with respect to all others barred by procedural requirements or res judicata." *Id.* at 543, 111 S.Ct. at 2447. He warned that "the applicability of rules of law is not to be switched on and off according to individual hardship." *Id.*

However, *Beam* did leave open the possibility that a court might, as a remedial matter, decline to apply a judicial decision retroactively and consider the equitable and reliance interests of a party otherwise adversely impacted by the new rule of law. *See id.* at 538–39, 111 S.Ct. at 2444–45. ("respondent [may] demonstrate reliance interest entitled to consideration in determining the nature of the remedy that must be provided . . . .").

Two years later, however, in *Harper* the Supreme Court solidified its position, holding that the Court's "application of a rule of federal law to the parties before [it] requires every court to give retroactive effect to that decision." 509 U.S. at 90, 113 S.Ct. at 2513. "[O]nce announced and applied to the parties to the controversy, [a rule of federal law] must be given full retroactive effect by all courts adjudicating federal law." *Id.* at 96, 113 S.Ct. at 2517.

Nonetheless, the *Harper* Court still did not definitively decide whether it adhered to *Beam*'s distinction between retroactivity as a substantive matter and retroactivity as a remedial question. However, the Court seemed to suggest that reliance interests did not justify withholding retroactive remedial relief, finding that "the federal law applicable to a particular case does not turn on whether the litigants actually relied on an old rule or how they would suffer from retroactive application of a new one." *See id.* at 95 n. 9, 113 S.Ct. at 2516 n. 9. The Court, declining to affirmatively overrule *Chevron Oil,* left open the possibility that retroactive application of a new rule of law may not bar a federal court from fashioning remedial relief which effectively modified the impact of the new rule of law. In fact, the outcome in *Harper* suggests that, retroactivity notwithstanding, a

court could still offer "appropriately crafted" remedial relief where necessary. Holding that an unconstitutional tax law must be applied retroactively, the Court still declined to order that the amounts paid under the unconstitutional tax be refunded, giving that decision to the Virginia courts to "craft[] any appropriate remedy." *Id.* at 102, 113 S.Ct. at 2520.

Finally, in *Hyde,* 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820, the Supreme Court clearly held that the retroactive application of new rule of law, except in certain limited and specifically defined circumstances, may not be thwarted by a court's equitable considerations in fashioning a remedy. The plaintiff in *Hyde* asked the Court to view *Chevron Oil* as a case relating only to the remedial stage of an action applying a new rule of law to a previously constitutional, but now unconstitutional, action. The Court rejected this argument, stating:

> We do not see how . . . [an inferior court] could change a legal outcome that federal law . . . would otherwise dictate simply by calling its refusal to apply that federal law an effort to create a remedy.

*Id.* at 753, 115 S.Ct. at 1748.

The Court clearly held that *Chevron Oil* does not allow a court to depart, as a general rule even at the remedial stage, from *Harper*'s requirement that a judicial decision be applied retroactively. However, it also articulated four specific circumstances where other than retroactive application of a prior decision can be awarded:

> [A court may find] (1) [an] alternative way of curing the constitutional violation, (2) [a] previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) . . . a well-established legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications, or (4) a principle of law that limits the principle of retroactivity itself.

*Id.* at 759, 115 S.Ct. at 1751. Thus, to the extent that a court may, after *Hyde,* still depart from the norm of retroactive application at the remedial stage, its authority to do

so has been limited to the most compelling circumstances. *See Ryder v. U.S.*, 515 U.S. 177, 183–84, 115 S.Ct. 2031, 2036–37, 132 L.Ed.2d 136 (1995) ("whatever the continuing validity of *Chevron Oil* after [*Harper*] and [*Hyde*], there is not the sort of grave disruption or inequity involved in awarding retrospective relief to this petitioner that would bring that doctrine into play").

### B. *Applying Beam–Harper–Hyde*

Having navigated through the landscape of the *Beam–Harper–Hyde* trilogy, we must now look to the case at hand and determine how these cases effect the analysis of the retroactive application of *Atlantic Coast II* and which court is called upon to undertake that analysis. Although we have no doubt that a state court is more than competent to go through the sequential analysis required in this case—first deciding the federal retroactivity issue and then, if necessary, deciding the state contract issues—we feel that the peculiar problems posed by the *Beam–Harper–Hyde* trilogy, namely interpreting the *Atlantic Coast II* injunction and then, possibly, fashioning an appropriate remedy under the *Hyde* exceptions, require that we exercise jurisdiction over the federal issues raised in this case.

In order to determine whether *Atlantic Coast II* applies retroactively to invalidate the Agreement, an interpretation of the injunction itself is necessary. As has become obvious through the briefing and oral arguments of the parties to this matter, the precise meaning of the *Atlantic Coast II* injunction is not entirely clear.[1] To avoid the problem of having a state court issue an interpretation which conflicts with our understanding of the injunction, we feel that it is incumbent upon this Court, to whom the effectuation of the injunction has been entrusted, *see Atlantic Coast II*, D.C. Civ. A. Nos. 93–2669 & 94–3244, Slip. Op. (3d Cir. Dec.18, 1997) (holding that this Court has jurisdiction over the *Atlantic Coast II* injunction), to clarify the proper mandate of *Atlantic Coast II*.

Furthermore, as recognized by Judge Roth in the *Atlantic Coast II* decision itself, a court faced with the decision of whether to apply a new rule of law retroactively, *may or may not* need also address the further issue of what kind of remedy, if any, it may fashion under *Beam–Harper–Hyde*. *Atlantic Coast II*, 112 F.3d at 672. If the court deciding this case finds that it *does* need to address the *Hyde* exceptions and ultimately fashion some type of remedy notwithstanding the requirement to apply *Atlantic Coast II* retroactively, that court will essentially be called upon to modify the *Atlantic Coast II* injunction. This a state court simply cannot do without threatening our jurisdiction and our power to effectuate *Atlantic Coast II*.

### C. *Power to Remove Under the Anti–Injunction Act and All Writs Act*

Under the Anti–Injunction Act and the All Writs Act, we have the power to assume jurisdiction of this case. Pursuant to the third exception to the Anti–Injunction Act, the so-called re-litigation exception, it is well-established that a federal court may enjoin a state proceeding where the result of state court litigation may eviscerate the effect of a federal court's order, or would render doubtful the rights of the parties effected by the federal injunction. *See Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 148–49, 108 S.Ct. 1684, 1690–91, 100 L.Ed.2d 127 (1988);[2] *Roodveldt v. Merrill Lynch*, 585

---

1. Two of the twenty-two county utilities authorities affected by the injunction have given us two entire different interpretations of it. It is quite possible, and in fact likely, that many other interpretations have been or will be offered by the remaining county utilities authorities to both the federal and state courts who find themselves with the difficult task of having to rule on the meaning of *Atlantic Coast II*.

2. *Chick Kam Choo v. Exxon Corp.*, 486 U.S. 140, 108 S.Ct. 1684, 100 L.Ed.2d 127 (1988), is the seminal case analyzing the relitigation exception to the Anti–Injunction Act. It involved the issue of whether a state court's decision on choice of law implicated a federal court's decision on choice of law. The Supreme Court, although remanding to the district court for entry of a more narrowly tailored injunction, explained that a federal court decision on choice of law prevents a subsequent state law action seeking to apply a different jurisdiction's law. In *Chick Kam Choo*, the federal district court had ruled that Singapore maritime law applied to a case brought by the wife of a Singapore resident who had been accidentally killed in that country while

F.Supp. 770, 783 (E.D.Pa.1984). The court may enjoin state proceedings at any point in time "from the institution to the close of the final process." *Hill v. Martin,* 296 U.S. 393, 403, 56 S.Ct. 278, 282, 80 L.Ed. 293 (1935); *see generally* 17 *Moore's Federal Practice* ¶ 121.04[3] (3d ed.1997); 17 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 4222 (2d ed.1988). Thus, the Anti–Injunction Act gives us the power to assume jurisdiction of the UCUA/BCUA dispute, even at this early stage of the proceedings, to prevent the state court from issuing any conflicting rulings.

■ We are also permitted to remove the state proceeding to this Court under the All Writs Act. Although federal courts will not remove a state case where there is only the theoretical potential for inconsistent or conflicting judgments, *see Pan Atlantic v. Republic Ins. Co.,* 878 F.Supp. 630, 643–44 (S.D.N.Y.1995), this is not such a case. Here, there is an actual existing ruling, *i.e.,* Judge Boyle's temporary restraining order, directly implicating our ability and duty, *see Atlantic Coast II,* D.C. Civ. A. Nos. 93–2669 & 94–3244, Slip. Op. (3d Cir.Dec.18, 1997), to properly determine the retroactivity issues, in light of *Beam–Harper–Hyde,* that must be decided before the analysis can proceed to an examination of the state contract issues. Thus, in order to protect our ability and duty, we will invoke our All–Writs Act powers and remove the state dispute to this Court.

UCUA relies on three cases to support its position that its state action should not be removed under the Anti–Injunction Act or All Writs Act. Although we agree with the decisions reached in all of these cases, we find that none of them announce holdings that have any applicability to the case at bar. In *Pan Atlantic v. Republic Insurance Co,* a federal court refused to remove a case pursuant to the All Writs Act because it held that the state court, by enforcing the parties' agreement to arbitrate, had acted entirely consistently with its prior federal ruling ordering the parties to arbitration. 878 F.Supp. at 643–44. Here, however, we cannot be certain that the state court will act consistently with our injunction. Furthermore, because of the possibility of having to fashion a remedy under the *Hyde* exceptions, a state court will be thrust into the position of directly challenging the *Atlantic Coast II* injunction.

■ In the In *Matter of Application of County Collector of County of Winnebago, Illinois,* 96 F.3d 890, 903 (7th Cir.1996), taxpayers challenged a tax levy that was intended to pay for a school district's obligations pursuant to a consent decree entered in settlement of a federal discrimination suit. The federal court refused to remove under the Anti–Injunction Act and the All Writs Act[3]

working on a ship owned by Exxon. The Fifth Circuit affirmed the district court's choice of law ruling, and also affirmed the district court's dismissal of the case on forum non conveniens grounds.

Plaintiff then filed suit in Texas state court, alleging claims under both Singapore law and Texas law. Defendant started a new action in federal court, seeking to enjoin plaintiff from proceeding in state court. The district court granted the injunction, prohibiting plaintiff from litigating in the state court entirely, and the Court of Appeals affirmed. The Supreme Court, in reversing and remanding, emphasized that "an essential prerequisite for applying the relitigation exception is that the claims or issues which the federal injunction insulates from litigation in state proceedings actually have been decided by the federal court." 486 U.S. at 148, 108 S.Ct. at 1690. Guided by that principle, as are we, the Supreme Court approved of the injunction as regarded the claims under Texas law, because the Federal Court had clearly an-

nounced that Singapore law applied, but found the injunction as issued too broad, as precluded plaintiff both from litigating under Singapore law, and from arguing the forum non conveniens issue under Texas's more lenient standards.

3. The *Winnebago* Court also determined that the state case was not removable pursuant to 28 U.S.C. § 1441(a), which provides for the removal of cases within the original jurisdiction of the district court, on the basis of federal question jurisdiction, 28 U.S.C. § 1331. It held that under the well-pleaded complaint rule, a federal question must appear on the face of the complaint in order to confer jurisdiction on a federal court. *See Caterpillar, Inc. v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 2429, 96 L.Ed.2d 318 (1987); *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9–10, 103 S.Ct. 2841, 2846, 77 L.Ed.2d 420 (1983). It found that the state court complaint challenging the tax levy issue presented no such federal question.

Three federal judges in this district have decided that contract disputes arising as a result of the

because it determined that the federal decree was in no way threatened by the district's chosen means to effectuate it. Again, because of the necessity of undertaking a *Beam–Harper–Hyde* analysis to properly decide this case, our federal injunction is directly at issue in the state court action.

Finally, we do not find *United States v. Ford,* 522 F.2d 962 (6th Cir.1975), a case involving both the Anti–Injunction Act and the All Writs Act, to be instructive here. In *Ford,* the court determined that a prior federal anti-trust divestiture decree did not have any bearing on the state contract issues raised by former employees. The state contract issues in *Ford,* unlike those involved here, required absolutely no interpretation or even application of the federal divestiture decree. In this case, to the contrary, the state court could not proceed with the necessary analysis unless it first addressed the interpretation and effect of the injunction, a determination we feel it should not be forced to make.

We believe that this case is more similar to that in *Yonkers Racing Corp. v. City of Yonkers,* 858 F.2d 855 (2d Cir.1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 833 (1989). In *Yonkers,* the court, under the All Writs Act, removed a state action challenging the propriety of condemnation proceedings ordered by a federal court. Removal was premised on the fact that "the issues raised" by the state court proceedings "[could not] be separated from the relief provided by the [federal court's order]." 858 F.2d at 865. Likewise, here,

there is no way that the state contract issues can be separated and then decided by the state court, until we first issue a determination of the retroactive effect of *Atlantic Coast II* on the executory duties of UCUA and BCUA.

In light of the above conclusions, we will remove the state court proceeding and assume jurisdiction over the UCUA/BCUA dispute. We will next proceed to an analysis, under federal law, of the retroactive effect of *Atlantic Coast II.* If, as a substantive matter, we find that *Atlantic Coast II* acts retroactively to abrogate the Agreement, we will also determine whether the injunction should be modified to provide an appropriate remedy to the parties involved.[4] Only if, as a result of these analyses, we conclude that *Atlantic Coast II* does not act retroactively to abrogate the Agreement, will the state contract issues, such as the determination of the plain meaning of the terms of the contract and whether or not the doctrines of impracticability or supervening illegality apply, *see Restatement of Contracts* 2d § 261, 264 (1981), become relevant. Should state law become the determinative factors in this case, we will then remand the case to the state court for decision of the state contract issues.

## III. CONCLUSION

Thus, for the foregoing reasons, we will grant BCUA's application inviting us to use our powers under the Anti–Injunction Act and All Writs Act to assume jurisdiction over

*Atlantic Coast II* opinion are not removable because no federal question was raised on the face of the complaint. *See County of Essex, et al. v. Port Authority of New York and New Jersey, et al.,* Civ. A. No. 97–3547(WHW) (D.N.J. August 25, 1995) (Walls, J.) (affirming decision of Magistrate Judge Pisano); *County of Gloucester, New Jersey et al. v. SES Gloucester Co. L.P. et al.,* Civ. A. No. 97–4590(JBS) (D.N.J. October 16, 1997) (Simandle, J.). We are unpersuaded by these cases. Federal question jurisdiction can exist over a state law claim if it is really one of federal law. *Franchise Tax Bd.,* 463 U.S. at 13, 103 S.Ct. at 2848. Under what is known as the "independent corollary" of the well-pleaded complaint rule, courts will look beyond the characterization of the state complaint to determine whether the claim actually does implicate an issue of federal law. *See, e.g., Federated Dept.*

*Stores Inc. v. Moitie,* 452 U.S. 394, 397 n. 2, 101 S.Ct. 2424, 2427 n. 2, 69 L.Ed.2d 103 (1981); *United Jersey Banks v. Parell,* 783 F.2d 360, 367 (3d Cir.1986). Here, we feel that, regardless of the fact that the complaint raised purely state contract issues, these state issues simply cannot be decided without first undertaking an analysis of the federal retroactivity issues. Thus, if we were given this case in the posture of a section 1441(a) removal, we would reach the same conclusion as we have under the Anti–Injunction Act and the All Writs Act and assume jurisdiction.

4. We note that our decision regarding the impact of *Atlantic Coast II* will effect many other entities, in addition to the two parties involved in the present dispute, who entered into long-term contracts prior to *Atlantic Coast II.*

this case and remove the Union County Superior Court action to this Court. If, after deciding the crucial federal retroactivity issues implicated here, we find that the contract is not rendered null and void, we will then remand that portion of the case back to Judge Boyle for adjudication of the state contract issues.