995 F.Supp. 506 (1998)
The UNION COUNTY UTILITIES AUTHORITY, a Public Body Corporate and Politic of the State of New Jersey, and Ogden Martin Systems of Union, Inc. (Intervenor), Plaintiffs,
v.
The BERGEN COUNTY UTILITIES AUTHORITY, a Public Body Corporate and Politic of the State of New Jersey, and The County of Bergen, New Jersey, a Municipal Corporation of the State of New Jersey, Defendants.
No. Civ.A. 97-6126(JEI).
United States District Court, D. New Jersey.
February 23, 1998.
*507 Bivona, Cohen, Kunzman, Coley, Yospin, Bernstein & DiFrancesco, by Steven A. Kunzman, Patrice M. Rodman, Warren, NJ, for plaintiff, the Union County Utilities Authority.
Sinisi, Van Dam, Sproviero & Sokolich, by Stephen P. Sinisi, Scott G. Sproviero, Paramus, NJ, for defendant, the Bergen County Utilities Authority.
Barbara H. Parker, Asst. County Counsel, Hackensack, NJ, for defendant, Bergen County.
Riker, Danzig, Scherer, Hyland & Perretti, LLP, by Robert J. Gilson, Morristown, NJ, for plaintiff-intervenor, Ogden Martin Systems of Union, Inc.
Peter Verniero, Atty. Gen. of New Jersey, by Stefanie A. Brand, Deputy Atty. Gen., Newark, NJ, for the State of New Jersey Dept. of Environmental Protection.
Riker, Danzig, Scherer, Hyland & Perretti, LLP, by Edward K. DeHope, Morristown, NJ, for Amicus Curiae, Integrated Waste Services Association.
Porzio, Bromberg & Newman, P.C., by Jay R. McDaniel, Morristown, NJ, for Amicus Curiae, MBIA Insurance Corp.

OPINION
IRENAS, District Judge.
Presently before the Court is the application of the Bergen County Utilities Authority *508 ("BCUA") requesting us to vacate a state court temporary restraining order which directs it to continue making payments to the Union County Utilities Authority ("UCUA") pursuant to the "put-or-pay" provisions of a solid waste disposal contract. Also before the court is UCUA's application for a preliminary injunction forcing BCUA to continue making payments under the contract. BCUA asks us to declare the contract, in its entirety, retroactively void and unenforceable as a result of the Third Circuit's opinion in Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County ("Atlantic Coast II"), 112 F.3d 652 (3d Cir.1997). UCUA and intervenor Ogden Martin Systems of Union, Inc. ("Ogden") ask us not to declare the contract void, requesting us instead to find that the "put or pay" provisions remain enforceable.
In Atlantic Coast II, the Third Circuit held that New Jersey's flow control statutes governing the disposal of in-state solid waste violated the dormant Commerce Clause. BCUA and UCUA entered into their long term "put or pay" contract prior to the decision in Atlantic Coast II. This contract, like many others among waste management districts throughout the state, was negotiated, entered into and approved by the New Jersey Department of Environmental Protection ("NJDEP") under the now unconstitutional regulatory scheme which excluded out-of-state facilities from consideration as possible sites for disposal of locally-generated waste. Although entered into well before November 10, 1997, the effective date of the Atlantic Coast II injunction, the UCUA/BCUA contract, and others like it, contains provisions imposing waste delivery obligations into the future which, if bargained for today, would be unenforceable and in violation of the Atlantic Coast II injunction.
In our Opinion of December 18, 1997, Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 988 F.Supp. 486, (D.N.J.1997), we found that a determination of a solid waste contract's validity required our interpretation of the scope of the Atlantic Coast II injunction and our consideration of its retroactive application to contractual rights and obligations bargained for before the injunction became effective. We now hold that the injunction prohibits the enforcement of executory waste delivery provisions of any contract entered into through a negotiation process that prohibited out-of-state competition. Whether or not (1) the remaining provisions of any contract are enforceable or (2) either party may be entitled to a monetary award of damages are determinations to be made by state courts on the basis of state law. Thus, we will refrain from making such a determination with regard to the UCUA/BCUA contract and will remand this case to the state court for resolution of the remaining state contract law issues.

I. BACKGROUND[1]

A. The Interdistrict Agreement

In 1987, UCUA contracted with Ogden for the construction and long-term operation of the Union County Resource Recovery Facility ("UCRRF"). The Ogden construction and service agreement was amended and restated on April 11, 1990, and has been amended further from time to time. Under the agreement, Ogden agreed to construct and operate the UCRRF for twenty years and to be paid a service fee based upon net tonnage plus a percentage of the energy revenues generated by the Facility. UCUA agreed to deliver and/or pay for disposal of a certain guaranteed annual tonnage per year at the UCRRF.
The UCRRF was to be located in Rahway, New Jersey. The proposed UCRRF had the capacity to process an amount of waste well in excess of the amount of processible waste currently generated within the boundaries of Union County. Thus, UCUA sought a regional partner to help in constructing and operating the facility and to commit to sending waste to the UCRRF to ensure its operation at capacity.
At this same time, having decided not to construct its own resource recovery facility, BCUA sought to enter into an agreement with a regional resource recovery facility in *509 order to meet the disposal needs of Bergen County. BCUA began negotiating for an agreement to utilize the Essex County Resource Recovery Facility. However, these negotiations eventually broke down. BCUA and UCUA then commenced negotiations for Bergen's participation in the UCRRF.
On October 24, 1991, BCUA and UCUA entered into a Memorandum of Understanding ("MOU") which evidenced the intent of the parties to enter into an interdistrict agreement under which UCUA would provide certain services for the processing of solid waste generated within Bergen County and, in return, BCUA would join UCUA in its efforts to construct and operate the UCRRF.
The MOU contained a "put or pay" provision which read:
The fees payable by the BCUA are an unconditional obligation and shall be payable by the BCUA whether or not the BCUA actually meets its delivery obligations of the minimum tonnage specified in Article 1.
MOU, Exh. B to BCUA's Application for Removal Pursuant to All Writs Act and Anti-Injunction Act, Article 3.1, at 5.
In April 1993, UCUA and BCUA entered into the Interdistrict Agreement which effectuated the terms of the MOU. The Interdistrict Agreement was amended on August 25, 1993. The Amended and Restated Interdistrict Agreement ("Agreement") superceded and replaced the MOU and the April agreement. See Agreement, Exh. C to BCUA's Application for Removal Pursuant to All Writs Act and Anti-Injunction Act.
The Agreement also contains a "put or pay" provision, mirroring the one contained in the MOU, which requires BCUA to deliver 192,000 tons of Bergen County processible waste to the facility each service year, or to make a payment on a monthly basis. Payments are to be made in accordance with Section 5.07 of the Agreement, which provides:
The payment obligation of the BCUA ... shall be an unconditional obligation to pay and shall continue and not be interrupted during any period that the UCUA's payment obligations continue to be payable and the BCUA shall not be relieved of such payment obligations for any reason, including, but not limited to, any Uncontrollable Circumstance, any failure of the Facility to operate or any failure of the BCUA to deliver Bergen Processible Waste to the Facility.
Agreement at 28-29.
The Agreement defines "Uncontrollable Circumstance" as
[A]ny act, event or condition having a material adverse effect upon the rights or obligations of either party hereunder if such act, event, or condition is beyond the reasonable control of the parties to this Agreement and is relied upon thereon as justification for failure to perform any obligation set forth herein or to comply with any condition required of the respective parties pursuant to this agreement. Such acts, events or conditions shall include, but not be limited to the following: ... any Change in Law....
Agreement at 8.
Change in Law is defined as:
[A] change in any Applicable Law, including, but not limited to: (a) the adoption, promulgation, issuance, modification or change in administrative or judicial interpretation of any Applicable Law; (b) the order or judgment of any federal, state or local court, administrative agency or governmental officer or body; and (c) the denial of an application for, delay in review, issuance or renewal of, or suspension, termination, interruption, imposition of a new condition in connection with the renewal or failure of renewal of any governmental permit, license, consent, authorization or approval.
Agreement at 6.
Section 7.03 of the Agreement states:
The parties hereto acknowledge that notwithstanding any Uncontrollable Circumstance, all payment obligations shall continue to be performed, including but not limited to those payments which may be attributable to amounts due on Facility Bonds.
Agreement at 35-36.

B. The Atlantic Coast Decision

Nearly a year and a half ago, we held that New Jersey's flow control laws, which require *510 waste management districts to contract with designated waste facilities for disposal of locally generated waste, were unconstitutional. Atlantic Coast II, 931 F.Supp. 341 (D.N.J.1996). We found that New Jersey's policy of self-sufficiency, which favors the designation of in-state waste facilities over those located out-of-state, violated the dormant Commerce Clause of the United States Constitution. Upon finding New Jersey's flow control laws unconstitutional, we granted a permanent injunction against the enforcement of flow control. However, because we believed that our injunction would cause serious disruption and financial harm to the state and citizens of New Jersey, we issued a two-year post-appeal stay of the permanent injunction. BCUA was a party to this matter but UCUA was not.
On May 1, 1997, the Third Circuit affirmed our holding that New Jersey's policy of self-sufficiency violated the dormant Commerce Clause. Atlantic Coast II, 112 F.3d 652 (3d Cir.1997). However, the Third Circuit reversed our two-year post-appeal stay, finding that we had erred in delaying the injunction of an unconstitutional law. Thus, the Court ordered that the injunction of the enforcement of New Jersey's waste flow directives, N.J.A.C. 7:26-6.5, would become effective upon the "denial of petitions for certiorari by the Supreme Court of the United States." Id. at 673. As a result of the Third Circuit's decision, we then modified our injunction on May 7, 1997. The Order we entered precisely mirrored that of the Third Circuit.
The Order enjoins the NJDEP "from enforcing those provisions of New Jersey Administrative Code 7:26-6.5 which, by designating in-state facilities as the sole providers of disposal and processing services, discriminate against out-of-state operators of waste disposal." It orders that "[i]nsofar as the defendants must select and contract with waste disposal facilities pursuant to N.J.A.C. 7:26-6.6 and 6.7 in order to comply with the provisions of ... [the Court's] injunction, they are permanently enjoined from implementing New Jersey's self-sufficiency policy as mandated under the State plan by abrogating existing valid contracts or rejecting or foreshortening contracts submitted to the New Jersey Department of Environmental Protection for review."
In striking down New Jersey's restrictions barring competition from out-of-state facilities and operators, the Third Circuit was careful to limit its finding of unconstitutionality to N.J.A.C. 7:26-6.5 and to set forth substantial areas of regulatory activity which are not constitutionally impermissible. The Court held that New Jersey:
can no longer implement its self-sufficiency policy  either formally or informally  by rejecting or hindering contracts between waste management districts and out-of-state facilities or operators.
Atlantic Coast II, 112 F.3d at 668.
The Court specifically noted that its injunction against the enforcement of N.J.A.C. 7:26-6.5 "leaves the bulk of New Jersey's waste disposal system in place," id. at 670, and "does not bar the enforcement of the State's remaining portions of either [the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 et seq. or the Solid Waste Management Act, N.J.S.A. 13:1E-1 et seq.]," id. at 668. It further stated:
[I]f the process for selecting waste disposal facilities no longer discriminates against interstate commerce, neither will the regulatory provisions enforcing such a non-discriminatory system. Although the State of New Jersey may no longer preclude the designation of out-of-state waste disposal facilities or operators, the State and the County Authorities remain free to regulate the flow of waste within New Jersey so long as the State's laws and regulations treat in-state and out-of-state facilities equally.
Id. Thus, it became incumbent upon the waste utility authorities in New Jersey to "modify their waste disposal plans and choose new facilities to service their needs in a non-discriminatory fashion." Id. at 670.
The Supreme Court denied certiorari in this case on November 10, 1997. Therefore, the injunction of the enforcement of N.J.A.C. 7:26-6.5 has now become effective.
On December 8, 1997, in a related case in this matter, the Third Circuit held that this Court has jurisdiction over the Atlantic Coast II injunction. Atlantic Coast II, 135 F.3d 763 (3d Cir.1997). Thus, we have now *511 been entrusted to address issues arising as a result of the resolution of this long, protracted litigation.
On February 3, 1998, the Third Circuit issued an Order amending its Atlantic Coast II decision. Denying a motion for clarification of the scope of the injunction on the grounds that it would be pointless since neither of the entities asking for clarification were parties to the Atlantic Coast II injunction, the Court nonetheless added some clarifying language to its earlier opinion:
By the same token, we do not, of course, express a view on any issue not before us. If for example, there be entities not before us who claim rights under contractual arrangements that they maintain are not the product of the discrimination here challenged, those alleged rights are beyond the scope of our adjudication.
Atlantic Coast II, 135 F.3d 891 (3d Cir.1998).

C. The UCUA/BCUA State Court Action

UCUA instituted a state court action in the Union County Superior Court to determine whether BCUA may terminate the Agreement. UCUA maintains the state court has jurisdiction over its case because the issues to be decided all hinge on state contract law. Judge Boyle of the Superior Court has entered a temporary restraining order in favor of UCUA which states that:
The Defendant BCUA is hereby temporarily restrained as of November 12, 1997 ... from terminating payments to the UCUA in the amounts required by [the Agreement]....
The Union County Util. Auth. v. The Bergen County Util. Auth., Dkt. No. UNN-C-161-97, Order to Show Cause With Temporary Restraints at ¶ 2 (N.J.Sup.Ct.Law Div., Nov. 12, 1997).
In an amended order, Judge Boyle has issued to BCUA an order to show cause:
why an order should not be granted in favor of the UCUA requiring the BCUA to continue to make the minimum required deliveries of solid waste to the [UCRRF] or pay for such minimum deliveries in accordance with the [Agreement] and/or, alternatively, make payments to the UCUA arising from the [Agreement], and why an order should not be entered enjoining defendants from taking further action to amend [their solid waste disposal plan] in a manner inconsistent with the obligations pursuant to and/or arising from the [Agreement] and for the continuation of the restraints imposed by the Court until final disposition of this matter or further Order to Show Cause.
The Union County Util. Auth. v. The Bergen County Util. Auth., Dkt. No. UNN-C-161-97, Revised Order to Show Cause With Temporary Restraints at ¶ 2 (N.J.Sup.Ct.Law Div. Dec. 2, 1997). The scheduling of the return date of any briefs in response to Judge Boyle's order to show cause has been held in abeyance pending our decision in this matter. Id. at ¶ 6.

D. Our December 18, 1997 Opinion

On December 18, 1997, upon the application of BCUA requesting us to exercise our power pursuant to the Anti-Injunction Act, 28 U.S.C. § 2283, and the All Writs Act, 28 U.S.C. § 1651, we assumed jurisdiction over certain portions of the dispute between UCUA and BCUA. We identified a two-prong sequence of analysis to address whether or not the Agreement remains enforceable, in part or in its entirety. We stated:
First, it must be determined whether or not the decisions and injunction in Atlantic Coast II relate back in time to retroactively void the Agreement. In order to determine Atlantic Coast II's retroactive effect, a court must (1) interpret, as a substantive matter, whether the injunction mandates abrogation of contracts that, if entered into today, would be clearly illegal (citations omitted), and (2) decide, as a remedial matter, whether a modification of the injunction is appropriate (citations omitted). These are purely questions of federal law and ones which require this Court to revisit in depth issues it has been struggling with since the inception of this litigation. Second, and only if the analysis under federal law does not lead to an invalidation of the Agreement, a court must decide the state contract issues implicated by the UCUA/BCUA dispute.
Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 988 F.Supp. 486, 492 (D.N.J.1997).
*512 We then asked the parties to submit briefs addressing the retroactive effect of the Atlantic Coast II injunction. On January 22, 1998, we granted the motion of Ogden to intervene as a plaintiff pursuant to Fed. R.Civ.P. 24(a) and 24(b). Both Ogden and the NJDEP have also submitted briefs upon the retroactive effect of the injunction.

II. DISCUSSION

A. Interpretation of the Atlantic Coast II Injunction

We first must clarify the scope of the Third Circuit's injunction and determine whether it was intended to retroactively void all existing contracts for solid waste disposal. Based on a careful examination of the language of the Order and the Third Circuit's expression of its intent in the Atlantic Coast II opinion, we find that the injunction does not mandate the full invalidation of all existing contracts.
BCUA relies on certain ambiguous language in the Third Circuit's Order to support its claim that the Atlantic Coast II injunction mandates the abrogation of all existing contracts for the disposal of solid waste. However, BCUA misinterprets both the meaning of the specific language relied upon and the clear intent of the Court as manifested elsewhere in the opinion. Contrary to BCUA's contentions, the Third Circuit did not issue any "abrogation mandate" requiring the abrogation of all existing long term contracts for waste disposal services. The Third Circuit's use of the term "abrogate" stems solely from its incorporation of any earlier injunction issued by a federal district court in New Jersey in a related solid waste disposal case.
The only provision of the Atlantic Coast II injunction which discusses contracts refers to contracts between in-state entities and out-of-state disposal facilities. It does not address contracts between two in-state entities.
Insofar as the defendants must select and contract with waste disposal facilities pursuant to N.J.A.C. 7:26-6.6 and 6.7 in order to comply with the provisions of this injunction, they are permanently enjoined from implementing New Jersey's self-sufficiency policy as mandated under the State Plan by abrogating existing valid contracts or rejecting of foreshortening contracts submitted to the New Jersey Department of Environmental Protection for review.
Atlantic Coast II, 112 F.3d at 673 n. 32, Order at ¶ 3. As described aptly by intervenor Ogden, the Atlantic Coast II injunction acts not as a sword to invalidate contracts, but as a shield to protect existing contracts with out-of-state disposal facilities. Ogden Br. at 16.
The Court intended its injunction to mirror that entered by the district court in Waste Management of Penn., Inc. v. Pollution Control Financing Authority of Camden County, 1997 WL 22574 (E.D.Pa. Jan.21, 1997), which, as noted by the Court, "enjoined the State of New Jersey from acting on its policy of abrogating, rejecting or foreshortening contracts between management districts and out-of-state facilities." Atlantic Coast, 112 F.3d at 663. It later borrowed from the Waste Management injunction in explaining what its Atlantic Coast II injunction required of the NJDEP: the "NJDEP can no longer implement the self-sufficiency policy  either formally or informally  by rejecting or hindering contracts between waste management districts, out-of-state facilities or operators." Atlantic Coast, 112 F.3d at 668. Prior to the Waste Management injunction, the NJDEP would shorten, abrogate, limit or otherwise require modifications to contracts between solid waste management districts and out-of-state entities by compelling them to have contracts end at an earlier period of time and by forcing the solid waste management districts to find in-state disposal facilities in conjunction with New Jersey's self-sufficiency policy. The Waste Management injunction applied solely to the NJDEP and did not seek to make any pronouncements on the contractual rights and obligations contained in disposal contracts between in-state facilities. The Third Circuit's reference to Waste Management in Atlantic Coast II recognized the NJDEP's role in reviewing waste disposal contracts and sought to prohibit the NJDEP from carrying out this role by implementing the now unconstitutional self-sufficiency policy. In other words, the Third Circuit wanted to ensure that the NJDEP no longer forced utilities authorities to shorten or abrogate contracts they had made with out-of-state facilities.
*513 Thus, the Atlantic Coast II injunction does not necessarily invalidate all existing contracts for the disposal and processing of solid waste in New Jersey. The plaintiffs in Atlantic Coast II did not seek such relief and the Third Circuit did not sua sponte decide to give it. At issue in Atlantic Coast II was whether or not New Jersey's policy of solid waste disposal self-sufficiency violated the dormant Commerce Clause. The plaintiffs merely sought an injunction prohibiting the NJDEP and the county utilities authorities from enforcing the waste flow directives that foreclosed out-of-state entities from competing for New Jersey's solid waste.[2] In fashioning the plaintiffs remedy, the Third Circuit carefully limited the scope of its injunction by specifying that it applied only to "New Jersey's waste flow control regulations" and "those provisions of N.J.A.C. 7:26-6.5 which, by designating instate facilities as the sole providers of disposal and processing services, discriminated against out-of-state operators of waste-disposal facilities." Atlantic Coast II, 112 F.3d at 673 n. 32, Order at ¶¶ 1, 2. It then explained the effect its injunction would have on the existing regulatory environment in New Jersey: "the disposal facilities presently listed [in N.J.A.C. 7:26-6.5] can no longer be considered the facilities to which each district's solid waste must be directed." Id. at 668.
Technically, the injunction itself operates only to prohibit the enforcement of any solid waste management plan which requires waste to be directed to an in-state facility designated without the participation of out-of-state competitors. However, its practical effect is much wider, requiring an analysis of the injunction's legal impact on the contracts that form the basis of each solid waste management plan. Any solid waste disposal contract negotiated at a time when New Jersey's policy of self-sufficiency was still in effect may potentially be implicated. We shall refer to such contracts as "Old Law Contracts." Atlantic Coast II does not affect all Old Law Contracts. There are two categories of Old Law Contracts, one which the Atlantic Coast II injunction does not impact and the other which it does. Old Law Contracts which were entered into in a discriminatory environment prohibiting the participation of out-of-state facilities are "Impacted Old Law Contracts." Old Law Contracts which were negotiated in an environment permitting competition from out-of-state entities are "Non-Impacted Old Law Contracts." Non-Impacted Old Law Contracts are left unscathed by Atlantic Coast II. The NJDEP may approve plans containing them and courts may specifically enforce them in their entirety. Impacted Old Law Contracts, on the other hand, are not left unscathed. All executory waste delivery provisions of Impacted Old Law Contracts violate Atlantic Coast II and may not be specifically enforced. However, as discussed below, not all provisions of Impacted Old Law Contracts are necessarily rendered entirely void as a result of Atlantic Coast II. See discussion infra at Part II.B.2.
The Third Circuit's latest pronouncement in the Atlantic Coast II matter reinforces our interpretation and supports our distinction between Non-Impacted Old Law Contracts and Impacted Old Law Contracts. In its February 3, 1998 Order amending its May 1, 1997 Atlantic Coast II decision, the Court denied a motion for clarification of the scope of the injunction on the grounds that it would be pointless to do so since neither of the entities asking for clarification were parties to the Atlantic Coast II litigation. Nonetheless, the Court added the following language to its original decision to shed further light on the scope of the injunction:
By the same token, we do not, of course, express a view on any issue not before us. If for example, there be entities not before us who claim rights under contractual arrangements that they maintain are not the *514 product of the discrimination here challenged, those alleged rights are beyond the scope of our adjudication.
Atlantic Coast II, 135 F.3d 891, Order at ¶ 2 (3d Cir.1998). We feel this addition delineates a bright line test, analogous to the one we have delineated, to determine whether or not executory obligations of existing solid waste contracts may be enforced. If a contract is not the "product" of the discrimination challenged in Atlantic Coast II, i.e., a Non-Impacted Old Law Contract, the contractual rights of the parties are not impacted by the injunction. On the other hand, as the Circuit's negative pregnant suggests, if a contract was negotiated under a process that did not permit competition from out-of-state entities, i.e., an Impacted Old Law Contract, the contractual rights of the parties are impaired by the injunction.

B. Retroactive Invalidation of Executory Waste Delivery Provisions

The Atlantic Coast II injunction must be applied retroactively. See Reynoldsville Casket Co. v. Hyde, 514 U.S. 749, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995); Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993); James B. Beam Distilling Co. v. Georgia, 501 U.S. 529, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991). Although the Third Circuit's most recent pronouncement supports our distinction between Non-Impacted Old Law Contracts and Impacted Old Law Contracts, it leaves ambiguous specifically which portions of an Impacted Old Law Contract violate Atlantic Coast II. Thus, to avoid further confusion and uncertainty as to Atlantic Coast II's effect, we must now delineate precisely what the retroactive application of Atlantic Coast II requires.[3]
In order to better understand how Atlantic Coast II retroactively affects entities involved in solid waste disposal in New Jersey, we must recall the central holding of the Atlantic Coast II decision: New Jersey's policy of self-sufficiency violates the dormant Commerce Clause and the state can no longer enforce it. Thus, we are called upon to determine how Atlantic Coast II implicates the state's power in relation to Impacted Old Law Contracts.
The state essentially serves two roles in this regard: 1) the state's executive branch as regulator and law enforcer; and 2) the state's judiciary as enforcer of contract rights. The NJDEP bears the responsibility for performing the duties of the state as regulator and law enforcer. The state courts bear the responsibility of enforcing private contractual rights and obligations.

1. State as Regulator and Law Enforcer

The NJDEP approves each of the solid waste management plans of the state's twenty-two waste management districts. The NJDEP has already issued regulations requiring all waste management districts to amend their plans in order to comply with Atlantic Coast II. See 29 N.J.R. 4169 (September 15, 1997) (proposed); 29 N.J.R. 5062, 5084 (December 15, 1997) (adopted).[4] Waste management districts must submit new plans that provide opportunities for out-of-state entities to compete for the provision of disposal services within their districts. When a waste management district submits an amended plan, the NJDEP's first task is to determine whether the plan contains an Impacted Old Law Contract.[5] To make this determination, the NJDEP must examine the negotiating process to discover whether or not out-of-state entities were permitted to submit bids and therefore compete for the provision of disposal services in accordance with the mandates *515 of the dormant Commerce Clause. The NJDEP may not approve any plan containing an Impacted Old Law Contract. It may only approve plans with Non-Impacted Old Law Contracts or newly negotiated non-discriminatory contracts. If the NJDEP finds that a plan contains an Impacted Old Law Contract, it must force the waste management district to further amend the plan to ensure that out-of-state entities have been offered an opportunity to participate in the provision of waste disposal services.
The NJDEP has already begun acting in accordance with its role as defined by Atlantic Coast II, Pursuant to the new regulations, the NJDEP has reviewed and issued certifications on plan amendments submitted by six counties. See Certification of Gary Sondemeyer, Assistant Commissioner for Environmental Regulation within the NJDEP, [hereinafter Sondemeyer Certif.] at ¶ 3. Adopted plan amendments from three other counties remain pending for further review by the NJDEP. See Sondemeyer Certif. at ¶ 4. The NJDEP has taken the position in reviewing plan amendments that districts can attempt to demonstrate that their prior procurement processes were nondiscriminatory and that all or part of their solid waste management systems may continue to be enforced. See NJDEP Br. at 12. Where the NJDEP determines that a plan is based on a Non-Impacted Old Law Contract, it gives its approval. For example, the NJDEP approved the portion of the August 21, 1997 Amendment to the Mercer County District Solid Waste Management Plan which provides for continued disposal at the GROWS landfill in Pennsylvania and approved with modification Mercer County's proposed non-discriminatory procurement process for transfer station services contingent upon submission of documents awarding a transfer station contract on a non-discriminatory basis. See Sondemeyer Certif. at ¶ 5. On the other hand, where the NJDEP determines that a plan is based on an Impacted Old Law Contract, it remands the plan for further modification. Unsatisfied with Atlantic County's submission of proofs attempting to establish a constitutional arrangement, the NJDEP remanded Atlantic County's request for reevaluation of the portions of its waste management plan which direct type 13 waste to the in-county Atlantic County Utilities Authority ("ACUA") and other types of waste to the transfer station operated by the ACUA. See Sondemeyer Certif. at ¶ 7. Thus, the NJDEP is carefully reviewing each district's amended plan to ensure that it complies with Atlantic Coast II.

2. State as Enforcer of Contract Rights

The state courts have the role of adjudicating the contractual rights and obligations of parties to an Impacted Old Law Contract. The Third Circuit made clear that New Jersey and its waste management districts may no longer direct solid waste to in-state facilities unless out-of-state entities have been offered an opportunity to compete for the provision of waste disposal services. Atlantic Coast II, 112 F.3d at 668-69. Therefore, Atlantic Coast II prohibits courts from specifically enforcing the executory waste delivery provisions of Impacted Old Law Contracts. We hold all such provisions to be retroactively void and unenforceable.
Although Atlantic Coast II requires state courts to retroactively void the waste delivery provisions of Impacted Old Law Contracts, it does not necessarily require courts to impose an absolute rule of invalidity when determining the contractual rights and obligations of parties to an Impacted Old Law Contract. Imposing an absolute rule of invalidity would have the effect of visiting 100% of the loss created by Atlantic Coast II upon the recipient of the solid waste, while the supplier of the waste would receive a windfall. By way of example,[6] applying an absolute rule of invalidity to the UCUA/BCUA Agreement imposes the full financial impact of Atlantic Coast II on UCUA, permitting BCUA to share in the benefits created by the injunction but not the burdens. UCUA would become financially responsible *516 for BCUA's contractual 40% share of revenues required to operate the UCRRF and to pay all necessary expenses, including debt service on the municipal bonds issued to finance the UCRRF's construction and operation. See UCUA Br. at 5. BCUA, on the other hand, having no contractual obligation to share these financial burdens, would benefit from the Atlantic Coast II injunction by being able to negotiate lower, competitive rates for the disposal of its waste at another facility.
As a general matter, both contracting parties are equally innocent victims of a state-imposed regulatory regime. So long as a court does not try to specifically enforce the provisions of an Impacted Old Law Contract requiring the delivery of waste to a specific disposal site, there is no particular logic or public policy reason why the economic loss caused by the Atlantic Coast II injunction should be visited totally on one side of the contract  the recipient of the solid waste stream. Rather, a court should consider the history of negotiations between the parties, the actual contract language, various common law contract doctrines and possibly newly articulated contract principles to determine whether either of the contracting parties may have certain rights against the other. It may be that in particular situations the loss should fall totally on one side or the other or partially on both sides. But whatever the result, it should flow from the particulars of the contractual relationship between the parties and not from the imposition of a blanket rule declaring all Impacted Old Law Contracts null and void.
Resolution of these complex problems is purely a matter of state law that will require creative remedy fashioning by the New Jersey state courts. Applying state law, the state courts must determine how best to allocate the contractual liabilities and economic burdens created by the Atlantic Coast II injunction. We recognize that this may not be an easy task.[7] Nonetheless, state courts have the entire arsenal of state contract law at their disposal:
1) the doctrine of mutual mistake, see Fisher Dev. Co. v. Boise Cascade Corp., 37 F.3d 104, 111-12 (3d Cir.1994); D.R. v. East Brunswick Bd. of Educ., 838 F.Supp. 184, 191 (D.N.J.1993); Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 608-09, 560 A.2d 655 (1989); Lampley v. Davis Mach. Corp., 219 N.J.Super. 540, 549-50, 530 A.2d 1254 (App. Div.1987); Smith v. Cynfax Corp., 261 N.J.Super. 378, 380, 618 A.2d 937 (Law Div. 1992); Arabia v. Zisman, 143 N.J.Super. 168, 362 A.2d 1221 (Ch.Div.1976) (contract entered into on assumption of the validity of an unconstitutional ordinance was the product of mutual mistake), aff'd, 157 N.J.Super. 335, 384 A.2d 1110 (App.Div.1978), cert. denied, 78 N.J. 335, 395 A.2d 204 (1978);
2) the doctrine of prevention by governmental regulation or order, see Restatement of Contracts (Second) § 264 (1981), W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983); Directions, Inc. v. New Prince Concrete Constr., 200 N.J.Super. 639, 644, 491 A.2d 1347, 1349 (App.Div.1985);
3) the doctrine of supervening impracticability, see Restatement of Contracts (Second) § 261 (1981); W.R. Grace, 461 U.S. 757; Dworman v. Mayor and Bd. of Aldermen, Governing Body of Town of Morristown, 370 F.Supp. 1056, 1071 (D.N.J.1974); Duff v. Trenton Beverage Co., 4 N.J. 595, 605, 73 A.2d 578 (1950); Connell v. Parlavecchio, 255 N.J.Super. 45, 49, 604 A.2d 625 (App.Div.), cert. denied, 130 N.J. 16, 611 A.2d 655 (1992); Directions, Inc., 200 N.J.Super. at 644, 491 A.2d 1347; Porcelli v. Titus, 108 N.J.Super. 301, 312, 261 A.2d 364, 370 (App.Div.1969), cert. denied, 55 N.J. 310, 261 A.2d 355 (1970);
4) the doctrine of supervening frustration, See Restatement of Contracts (Second) § 265 (1981); General Elec. Capital Corp. v. Charleston, 1989 WL 9363, at *5 (E.D.Pa. 1989), order aff'd, 898 F.2d 140 (3d Cir.1990); Seitz v. Mark-O-Lite Sign Contractors, Inc., 210 N.J.Super. 646, 510 A.2d 319, 322 (1986); Republic Factors v. Carteret Work Uniforms, 24 N.J. 525, 133 A.2d 6, 10-11 (1957); A-Leet *517 Leasing Corp. v. Kingshead Corp., 150 N.J.Super. 384, 397, 375 A.2d 1208 (App.Div. 1977), cert. denied, 75 N.J. 528, 384 A.2d 508 (1977); Porcelli, 108 N.J.Super. at 313, 261 A.2d 364; Model Vending, Inc. v. Stanisci, 74 N.J.Super. 12, 16, 180 A.2d 393, 395 (Law. Div.1962); Adams v. Jersey Cent. Power & Light Co., 36 N.J.Super. 53, 69, 114 A.2d 776 (Law Div.1955), aff'd 21 N.J. 8, 120 A.2d 737 (1956); Edwards v. Leopoldi, 20 N.J.Super. 43, 54, 89 A.2d 264, 270 (App.Div.1952), cert. denied, 10 N.J. 347, 91 A.2d 671 (1952); and
5) the principle that contracts against public policy may be void, see W.R. Grace, 461 U.S. at 766; Hurd v. Hodge, 334 U.S. 24, 34-35, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); Vasquez v. Glassboro Serv. Ass'n. Inc., 83 N.J. 86, 98-101, 415 A.2d 1156 (1980); Lehigh Valley R. Co. v. United Lead Co., 102 N.J.L. 545, 133 A. 290 (1926) (citing Public Serv. Elec. Co. v. Board of Public Util. Comm'rs, 87 N.J.L. 128, 93 A. 707 (1915), aff'd, 88 N.J.L. 603, 96 A. 1013 (1916); Saxon Constr. v. Masterclean, 273 N.J.Super. 231, 236, 641 A.2d 1056 (App.Div.), cert. denied, 137 N.J. 314, 645 A.2d 142 (1994); Driscoll v. Burlington-Bristol Bridge Co., 10 N.J.Super. 545, 575, 77 A.2d 255 (Ch.Div.1950), modified on other grounds, 8 N.J. 433, 86 A.2d 201, cert. denied, 344 U.S. 838, 73 S.Ct. 25, 97 L.Ed. 652 (1952).
Although parties who contract in highly regulated environments are on notice that the law may change against their interest, see Connolly v. Pension Benefit Guar. Corp., 475 U.S. 211, 227, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986), it does not necessarily follow that the entire burden of that change should be visited upon any one party absent contractual provisions specifically allocating the risk of a change in law. For example, contracts are void as against public policy or because of supervening frustration of purpose only where the offending portion of the contract is so central to the contract that it cannot be severed from the whole. See, e.g., Hurd v. Hodge, 334 U.S. at 35; International Tracers of America, Inc. v. Rinier, 139 N.J.Super. 573, 354 A.2d 683, (App.Div.1976). Courts consistently have held that contracts should be construed in ways that preserve the legality and validity of the agreements that the parties have freely entered into, even where portions of the contracts may subsequently become void because of government orders. See Ryan v. Brown Motors, 132 N.J.L. 154, 39 A.2d 70 (E & A 1944) (employment contract of general manager and secretary of car dealership was not rendered void by orders of the federal government limiting the opportunities for transactions concerning the sales of motor vehicles); Proprietors' Realty Co. v. Wohltmann, 95 N.J.L. 303, 112 A. 410 (1921) (lessee not discharged from liability to pay rent pursuant to terms of lease of premises "to be used and occupied as a cafe and for no other purpose whatsoever" merely because he was subsequently deprived of their use for the sale of intoxicating liquors as a result of the Eighteenth Amendment).
Thus, state courts should consider whether the sole or primary purpose of an Impacted Old Law Contract was to provide for the delivery of in-state solid waste to an in-state facility as designated in N.J.A.C 7:26-6.5. Although many contracts may fit this description, others may not. UCUA has claimed that the purpose of their contract with BCUA was to create a regional partnership for the construction and operation of a resource recovery facility to serve the long term needs of both Union and Bergen Counties. UCUA Br. at 26-27. Thus, it claims that the Atlantic Coast II injunction does not interfere with the parties' partnership goals of "sharing financial risks" and preserving "the economies of scale inherent in larger facilities." McEnroe Order at 14-15, Exh. A to UCUA Compl. A state court analyzing such an argument will have to carefully examine the language of the contract and the evidence of the parties' intent to determine the extent to which the Atlantic Coast II injunction frustrated their contractual goals.
State courts should also consider whether or not the parties specifically allocated the risk of the invalidation of flow control through the inclusion of a force majeure clause or similar clause. The UCUA/BCUA Agreement included a force majeure clause which UCUA and Ogden argue allocates the risk of Atlantic Coast II's invalidation of flow control to BCUA. Section 5.07 of the Agreement provides that "Uncontrollable Circumstances" will not excuse BCUA's payment obligation. Agreement at 28-29. "Uncontrollable *518 Circumstances" are defined as including a "Change in Law." Agreement, Section 1.01, at 6 and 8.[8] State courts analyzing this and similar force majeure clauses must determine whether the parties intended to allocate the risk of flow control being declared invalid when they agreed to such clause.
Many challenges to the legality of waste flow control systems were instituted well before the execution of the Interdistrict Agreement and other solid waste management districts' agreements. See, e.g., Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978); Harvey & Harvey, Inc. v. Delaware Solid Waste Auth., 600 F.Supp. 1369 (D.Del.1985); J. Filiberto Sanitation, Inc. v. State of New Jersey, 857 F.2d 913 (3d Cir.1988), overruled by Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atlantic County, 48 F.3d 701 (3d Cir.1995); Town of Clarkstown v. C & A Carbone, Inc., 182 A.D.2d 213, 587 N.Y.S.2d 681 (1992), rev'd, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994). Legal scholars were also debating the constitutionality of flow control laws throughout the 1990s. See, e.g., Harper, Note, "Waste Transport: Commerce Clause Restrictions and Free Market Incentives," 24 Akron L.Rev. 681 (Spring 1991); McKistry and Brown, "A Checklist for Legally Enforceable Obligations to Use Disposal Services," C816 ALI-ABA 289 (October 1993); McKistry and Brown, "A Checklist for Legally Enforceable Obligations to Use Disposal Services," C659 ALI-ABA 377 (January 1992); Suhroff, "Solid Waste Flow Control and the Commerce Clause: Circumventing Carbone," 7 Alb. L-J Sci. & Tech. 185, 188-189 (1996); Turner, "The Flow Control of Solid Waste and the Commerce Clause: Carbone and its Progeny," 7 Vill. Envtl.L.J. 203 (1996).
Contracting entities may very well have been aware of the possibility that New Jersey's policy of self-sufficiency would be held constitutionally invalid. Where they did not specifically contractually allocate that risk, a court must weigh the legal consequences of this absence. See, e.g. United States v. Winstar Corp., 518 U.S. 839, 116 S.Ct. 2432, 2469, 135 L.Ed.2d 964 (1996); Dworman, 370 F.Supp. at 1071; Schiff v. Schiff, 116 N.J.Super. 546, 561, 283 A.2d 131 (App.Div.1971); Edwards v. Leopoldi, 20 N.J.Super. at 53, 89 A.2d 264; City of Newark v. North Jersey Dist. Water Supply Comm'n., 106 N.J.Super. 88, 254 A.2d 313 (Ch.Div.1968), aff'd., 54 N.J. 258, 255 A.2d 193 (1969); Model Vending Inc., 74 N.J.Super. at 16, 180 A.2d 393; Lincoln Bus Co. v. Jersey Mut. Cas. Ins. Co., 112 N.J.Eq. 527, 164 A. 867 (Ch.Div.1933).
On the other hand, some contracting parties may have foreseen the possibility that flow control would be invalidated and may have specifically provided for the contractual obligations of the parties if that event should occur. It is not uncommon for contracts to contain clauses that specify that each party is excused from failures in the performance of any act by reason of certain enumerated uncontrollable circumstances. Where the parties have defined uncontrollable circumstances by language that might include the entry of a federal injunction such as the one in Atlantic Coast II, the parties may be totally excused from all duties and obligations arising under the contract. If the language is ambiguous, the court will have to determine what the parties intended to include as an uncontrollable circumstance that might excuse performance.
Doctrines of quasi-contract (also known as contracts implied in law), contracts implied in fact and joint venture may, in particular circumstances, be available to assist a state court in equitably allocating the economic burdens created by Atlantic Coast II. See, e.g., Wanaque Borough Sewerage Auth. v. Tp. of West Milford, 144 N.J. 564, 677 A.2d 747 (1996); In Re Saint Barnabas Med. Ctr. v. Essex County, 111 N.J. 67, 543 A.2d 34 (1988); St. Paul Fire and Marine Ins. Co. v. *519 Indemnity Ins. Co. of North America, 32 N.J. 17, 22-23, 158 A.2d 825 (1960); Hudson City Contracting Co. v. Jersey City Incinerator Auth., 17 N.J. 297, 307, 111 A.2d 385 (1955); Callano v. Oakwood Park Homes Corp., 91 N.J.Super. 105, 108, 219 A.2d 332 (App.Div.1966); Shapiro v. Solomon, 42 N.J.Super. 377, 383, 126 A.2d 654 (App.Div. 1956).
In short, there are a wide variety of state law doctrines which might be applied in interpreting and fashioning remedies with respect to Impacted Old Law Contracts which would equitably allocate the economic loss caused by the Atlantic Coast II injunction without running afoul of the injunction itself. It is probably fair to say that every such contract is different in its negotiating history, language, intent, and operation. While each shares the common characteristic that they can no longer dictate the flow of the waste stream as originally contemplated, it does not follow that all rights or obligations which arise from it have been swept away. We see no reason why the state courts might not fashion contractual remedies under Impacted Old Law Contracts which do not transgress the full sweep of the Atlantic Coast II injunction.

C. Modification of the Injunction To Provide Relief From the Retroactive Application of Atlantic Coast II Is Not Necessary

In our December 18, 1997 Opinion, we explained at length the rule of retroactivity as set forth in the Beam-Harper-Hyde trilogy and explored the circumstances under which a court may fashion a remedy allowing other than pure retroactive application of a prior decision. See Atlantic Coast Demolition and Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 988 F.Supp. 486, 492-96 (D.N.J.1997). As we noted, the rule of retroactivity generally requires a court to retroactively apply a judicial decision "`whether the litigants actually relied on an old rule or how they would suffer from retroactive application of a new one.'" Id. at 493 (quoting Harper v. Virginia Dep't of Taxation, 509 U.S. 86, 95 n. 9, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993)). A court may depart from the norm of retroactive application at the remedial stage under only the most compelling circumstances:
[A court may find] (1) [an] alternative way of curing the constitutional violation, (2) [a] previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) ... a well-established legal rule that trumps the new rule of law, which general rule reflects both reliance interests and other significant policy justifications, or (4) a principle of retro-activity itself.
Reynoldsville Casket v. Hyde, 514 U.S. 749, 759, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995).
We find that the scope of the Atlantic Coast II injunction makes it unnecessary for us to modify the injunction to provide remedial relief from its retroactive effect. Non-Impacted Old Law Contracts are outside the scope of the injunction. While this injunction will reach back retroactively to eliminate the possibility that Impacted Old Law Contracts will frustrate its effect, the constitutional violation can been cured without the total abrogation of all rights and obligations under such contracts. Under state law, it is possible that some contractual provisions will survive Atlantic Coast, and in these situations it will be up to the state court to examine principles of state law and equitably determine how the burden of any loss resulting from the retroactive effect of Atlantic Coast II should be allocated. In applying the Hyde factors, we find that remedial modification of the injunction by this Court is unnecessary because of the availability of state law under which the burdens of the Atlantic Coast II injunction can be equitably allocated without violating the injunction in its present form. Thus, we will leave it up to the state courts to determine whether or not any further remedial relief should be issued under principles of state law.

D. Judge Boyle's Temporary Restraining Order

Our holding today establishes that courts may not specifically enforce the executory waste delivery provisions of an Impacted Old Law Contract. Beyond that, we leave analysis of all state contract issues to the state courts. Because we conclude that the resolution *520 of the contractual dispute between UCUA and BCUA is one to be resolved by the state court, we will remand this case back to Judge Boyle for further proceedings. Therefore, we will deny BCUA's application for a vacation of Judge Boyle's temporary restraining order. Judge Boyle held in abeyance pending our decision the scheduling of the return date of any briefs in response to his order to show cause why a permanent order should not be granted in favor of UCUA. UCUA has asked us to transform Judge Boyle's temporary restraining order into a preliminary injunction. Because we are remanding this matter to Judge Boyle, we will refrain from taking any further action in this matter. Judge Boyle's order to show cause will become effective upon the issuance of our Opinion and Order in this matter and we feel the parties should resolve all further issues before Judge Boyle.[9]

III. CONCLUSION
For the foregoing reasons, we hold that the Atlantic Coast II injunction prohibits the NJDEP from approving any solid waste management plan containing an Impacted Old Law Contract. We also hold that the injunction prohibits state courts from specifically enforcing the executory waste delivery provisions of an Impacted Old Law Contract. Such provisions are retroactively void. Whether or not any other provisions remain enforceable is an issue best determined by state courts. We also find that state courts are best equipped to fashion equitable remedies which, where appropriate, allocate the economic burdens created by Atlantic Coast II. Therefore, we will deny BCUA's application requesting us to vacate Judge Boyle's temporary restraining order. We will also deny UCUA's application for a preliminary injunction. Because there remain no federal issues for us to decide, we will remand this matter to the Union County Superior Court for further adjudication by Judge Boyle.
NOTES
[1] The background section of our Opinion is taken largely from our December 18, 1997 decision in this matter. Atlantic Coast Demolition and Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 988 F.Supp. 486, 488-91 (D.N.J. 1997).
[2] As stated in the WHEREFORE paragraphs of plaintiff's Complaint, plaintiffs sought prospective relief:

a. Declaring that the solid waste plans identified in N.J.A.C. 7:26-6.5 violate the Commerce Clause of the United States Constitution and are unconstitutional and void;
b. permanently enjoining defendants from prohibiting or otherwise interfering with the transfer of waste by Waste Management Association members to solid waste facilities other than those approved under N.J.A.C. 7:26, Subchapter 6; ....
Atlantic Coast II, Pl. Compl.
[3] We note that the New Jersey Appellate Division, in a decision rendered five days before the Third Circuit's stay was lifted on November 10, 1997, held that Atlantic Coast II applies retroactively to vacate penalties imposed on waste haulers for not abiding by the now unconstitutional waste flow directives. In re A. Fiore & Sons, Inc., 305 N.J.Super. 192, 701 A.2d 1303 (App. Div.1997). The Court found that haulers should not be penalized for exercising their constitutional right under the Commerce Clause to make out-of-state deliveries. Id. at 208, 701 A.2d 1303.
[4] An appellate challenge to these regulations was filed on December 15, 1997, Ocean County Landfill v. New Jersey Dep't of Envtl. Protection, Dkt. No. A-2142-9TT2 (N.J.Sup.Ct.Law Div. Dec. 15, 1997).
[5] The NJDEP performs many other regulatory functions in the context of solid waste disposal. However, we focus here only on those functions it must perform with regard to contracts for the disposal of solid waste.
[6] We use the UCUA/BCUA Agreement as an example only. We make no determination as to whether or not the UCUA/BCUA contract qualifies as an Impacted Old Law Contract. Unless such a determination is made, the situation in our hypothetical will not arise because the contract will be enforceable in its entirety.
[7] We note that the state courts may find that the complex and unique equities at issue in any matter involving waste delivery contracts negotiated under the pre-Atlantic Coast II regulatory environment may not easily be resolved under current law and that an entire new doctrine of state common law must be developed in order to appropriately handle such matters.
[8] Section 7.03 also provides that certain performance obligations, but not payment obligations, may be excused by reason of an Uncontrollable Circumstance. The last paragraph of Section 7.03 provides:

The parties hereto acknowledge that notwithstanding any Uncontrollable Circumstance, all payment obligations shall continue to be performed, including but not limited to those payments which may be attributable to amounts due on Facility Bonds.
Agreement at 36.
[9] Of course, nothing in this Opinion should be construed as expressing any opinion on the restraining order previously entered by Judge Boyle or on any matter pending before him, except to the extent of our interpretation of the scope of the Atlantic Coast II injunction.